Willie A. HORTON, Appellant,

v.

UNITED STATES, Appellee.

No. 86–1235.

District of Columbia Court of Appeals.

Argued Feb. 9, 1988.
Decided May 4, 1988.

---

Richard K. Gilbert, Washington, D.C., appointed by this court, for appellant.

Elizabeth H. Danello, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty. at the time the brief was filed, and Michael W. Farrell and J. Edward Agee, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before FERREN, BELSON, and ROGERS, Associate Judges.

FERREN, Associate Judge:

Appellant Willie A. Horton was charged with three counts of assault with a pistol, D.C.Code § 22–502 (1981), three counts of assault with a shotgun, *id.*, and one count of carrying a pistol without a license, D.C. Code § 22–3204 (1981). The trial court denied his pretrial motion to suppress a shotgun seized by police from the vicinity of the house in which he lived. A jury subsequently acquitted appellant of the shotgun charges but convicted him on all three counts of assault with a pistol and on the

single count of carrying a pistol without a license. He now appeals the denial of his motion to suppress the shotgun. He also challenges two of the three assault convictions on two grounds: the jury verdict was not clearly unanimous; alternatively, the two challenged convictions must merge. We agree, on the record before us, that jury unanimity is not clearly apparent with respect to appellant's convictions of assault with a pistol on Rickie Marsh and on Carlton Stewart; accordingly, we reverse appellant's convictions on those two charges. We also remand the case for a factual finding as to whether the police found the shotgun inside or outside the curtilage of appellant's home. If the trial court finds that the police took the shotgun from within the curtilage, the court shall order suppression of the shotgun and, as a consequence, shall order a new trial of the other counts, namely assault with a pistol against Marcell Marsh and carrying a pistol without a license. Should the trial court determine, however, that the shotgun was seized from outside the curtilage and was thus properly admitted into evidence, appellant's convictions on those counts shall stand.

## I.

To understand the arguments raised on appeal, one must have a comprehensive understanding of the facts. The criminal charges at issue are attributable to a street altercation between two rival groups of friends in a northwest Washington, D.C., neighborhood. In the late evening of June 25, 1985, Marcell Marsh, his brother Rickie Marsh, and their friend Carlton Stewart encountered appellant, his friend Donald Hairston, a young man named Tony, and a young woman. The Marsh group had just purchased some beer and was walking east on the south side of W Street, N.W., toward Carlton Stewart's house. Stewart and Rickie Marsh were walking several

yards ahead of Marcell Marsh, who had paused to speak with an acquaintance. The government's witnesses testified that, when Marcell Marsh encountered Donald Hairston[1] proceeding west on W, the two, who knew and disliked one another, each refused to yield and consequently bumped shoulders. Hairston and Marsh began to argue. Hearing the argument, Rickie Marsh and Stewart turned around. Stewart put the beer down in his front yard, and he and Rickie Marsh walked back toward where Marcell Marsh and Hairston stood.

Marcell Marsh testified that Hairston at that point pulled a black pistol from his waist and shot at him from a distance of approximately twenty feet. Undeterred by the shot, Marcell Marsh walked up to Hairston, ready to fight. Marsh testified that Hairston then walked into the street and fired at him again. Marsh further testified that when Hairston had fired the second shot, appellant had jumped onto the roof of a nearby parked car holding a sawed-off shotgun, which he had pointed in the direction of Rickie Marsh and Stewart. According to Marcell Marsh, appellant had encouraged Hairston to shoot. Appellant then had jumped down from the car, taken the pistol from Hairston, and, according to Marcell Marsh, had "started shooting at Carlton [Stewart] and my brother." Marsh testified that appellant had been standing approximately a yard to a yard-and-a-half from Rickie Marsh and Stewart when he fired. Appellant, Hairston, and their companions then ran into an alley.

The testimony of Carlton Stewart and of Rickie Marsh was much the same as that of Marcell Marsh. Stewart testified, however, that appellant had fired his first shot at Rickie Marsh alone, from a distance of approximately seven feet, while Stewart had stood near Rickie Marsh, approximately three feet away.[2] Rickie Marsh testified

---

**1.** Donald Hairston, appellant's co-defendant, pled guilty to possession of a prohibited weapon on charges arising out of the same incident. At trial, he testified for the defense.

**2.** Although Stewart testified on direct examination that appellant had "fired at Rickie Marsh,"

he later testified on cross-examination as follows:
　Q. How far was, were you from Mr. Horton when you say he fired the pistol at Rickie Marsh?
　A. I'd say—
　Q. I beg your pardon?
　A. Probably about 7 feet, I don't know.

that appellant had taken the gun from Hairston, "pointed it at me and fired." In addition, Stewart testified that appellant had fired a second shot "in our general direction" as appellant and his friends ran to the alley. Rickie Marsh related a similar version of the facts, stating that as appellant and his group had run into the alley, appellant turned and fired in the direction of Rickie Marsh, Marcell Marsh, and Stewart.

The government also presented the testimony of two witnesses who had observed the altercation from their homes nearby. Sherri Bryant testified that she had heard a shot and loud voices and looked out onto W Street where she had seen a group of young men arguing. Bryant had seen one man holding a shotgun but had been unable to tell for sure which man it was. Marie Gibbs also had heard "loud talking," heard a shot, and observed the flash from a pistol. Neither woman testified that she had heard more than one shot.

Finally, the government presented testimony from the officer who had recovered a disassembled shotgun from the rear of appellant's house. Officer Julius Cook had found the gun next to a set of steps leading into the alley, just outside the fence enclosing the yard. The gun had been enclosed in a yellow suitcase. The government's witnesses identified the shotgun at trial as being similar to the one they had seen the night of the altercation. The parties stipulated that the shotgun had been tested and found to be inoperable because of a faulty firing pin.

Donald Hairston testified for the defense. He said that the altercation between the two groups of friends had begun when Marcell Marsh intentionally bumped into him, saying it was a "stick up." Hairston then had seen Rickie Marsh and Carlton Stewart coming out of the alley with sticks and had seen Marcell Marsh pick up

Q. And what did Mr. Horton do then?
A. *I told you he fired the gun at Rick and I.*
Q. Then what happened? Rickie jumped behind you, where did Mr. Horton go?
A. And Donald [Hairston] ran toward the alley where he turned around and fired again in our general direction.

a "pickfork" (which Hairston later described as an ice pick) and a hammer. At that point, another person in Hairston's group, Andre Cook, had pulled out a starter pistol belonging to Hairston and given it to him. Hairston, knowing the pistol fired only blanks, had fired it into the air in an effort to scare off Stewart and the Marsh brothers. According to Hairston, however, the Marsh brothers apparently had known the pistol was not real and thus had not been frightened by it. Appellant had taken the pistol from Hairston and fired it into the air again, saying "it's a joke." Hairston denied that anyone in his group had carried a shotgun that night.

Appellant took the stand in his own behalf. Like Hairston, appellant described the Marsh group as the aggressor. Appellant testified that he had first become involved in the altercation when he heard one of the Marsh brothers arguing with Hairston. The person arguing with Hairston had had a hammer and a "big old fork" in his hands, and the other two in that group had held sticks. Appellant had heard a bang and had gone over to Hairston and the Marsh brother with whom Hairston was arguing, to see what was going on. He saw a small black pistol in Hairston's hand. Appellant took the pistol from Hairston and crossed to the north side of W Street. The Marsh group started coming at him, still holding sticks, a hammer, and the fork. Appellant then shot the pistol into the air in an effort to scare them. When they kept approaching, he ran away through the alley. Appellant, too, denied having a shotgun that night.

**II.**

Before trial, appellant moved to suppress the shotgun seized by Officer Cook from behind the house where appellant lived with his grandparents. The trial court denied the motion.[3] Although Offi-

(Emphasis added.)

3. The trial court heard lengthy argument by both parties but took no evidence.

cer Cook had seized the shotgun without a warrant because of an anonymous tip to the police, the trial court found that appellant lacked standing[4] to assert a fourth amendment interest in the shotgun. Appellant now challenges the trial court's ruling, arguing that the suitcase and the shotgun lay within the protected curtilage of appellant's home and that the item searched and seized—a suitcase—comes within none of the exceptions to the presumptive fourth amendment protection against warrantless searches and seizures that the curtilage is understood to afford. We address each issue in turn.[5]

## A.

It is well established that everyone has a reasonable expectation of privacy for fourth amendment purposes not only in one's home but also in the curtilage surrounding the home. *Dow Chemical Co. v. United States*, 476 U.S. 227, 235, 106 S.Ct. 1819, 1825, 90 L.Ed.2d 226 (1986). The concept of curtilage, however, evades concrete definition. It is a concept which originated at common law to extend protection under the law of burglary not only to the house but also to the area surrounding the house. *United States v. Dunn*, — U.S. —, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326 (1987). Curtilage has been described in contemporary cases as the area "to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984) (quoting *Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886)). More recently, the Supreme Court has suggested

that the curtilage may be defined with reference to the following four factors:

[1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, [4] and the steps taken by the resident to protect the area from observation by people passing by.

*Dunn*, 107 S.Ct. at 1139 (barn fifty yards outside fence surrounding house, unprotected from view from adjacent open fields, held not to be within curtilage). The Court has added, however, that "these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.*

We believe that, as to cases concerning homes in the city, the factors in *Dunn* must be evaluated with reference to the obvious attributes of an urban environment. Proximity to the home, for example, may be virtually irrelevant if the area surrounding the house is quite small. Likewise, the absence of a fence or other means of excluding passersby from the area may be less significant in an urban than in a rural area, since the configuration of the streets and houses in many parts of the city may make it impossible, or at least highly impracticable, to screen one's home and yard from view. (On the other hand, because a fence may be unusual in some neighborhoods, a particular fence may be evidence tending to show a limit on one's privacy interest to the area enclosed.) In

4. We understand the trial court's ruling to mean that appellant "lacked standing" to challenge introduction into evidence of the shotgun confiscated by the police because he lacked a reasonable expectation of privacy in the area searched and the items seized. *See Rakas v. Illinois*, 439 U.S. 128, 140, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978); *Moore v. United States*, 468 A.2d 1342, 1345 & n. 11 (D.C.1983).

5. The government urges us to conclude that the error, if any, in admitting the shotgun was harmless in light of the fact that appellant was acquitted on the shotgun charges. The shotgun,

however, was an essential element in the testimony of each of the government's witnesses. The physical presence of the shotgun in the courtroom substantially undermined the credibility of the scenario presented by the defense. Without the shotgun, appellant's theory of self-defense might have persuaded the jury not only with respect to the shotgun charges but also with respect to the pistol charges. Accordingly, we conclude that if there was error in admitting the shotgun, that error cannot be deemed harmless.

any event, in an urban area, substantial weight may have to be accorded the uses to which one's real estate is put, for actual use of the yard and related property is likely to be the primary way in which one asserts an intimate tie to the home.

■ The trial court concluded that appellant, as a matter of law, lacked a fourth amendment interest in the suitcase and the shotgun because those items were taken from the area outside the fence surrounding his home, albeit still within the property line. Although the trial court's precise conclusions are somewhat difficult to discern from the court's oral ruling, the court noted that the suitcase was located outside the fence, near the alley, where any passerby could easily pick it up. The court then concluded that the location of the suitcase failed to manifest a reasonable expectation of privacy in the suitcase and its contents and, thus, that appellant lacked standing to challenge the officer's seizure and search. We understand from the trial court's ruling that the court did not consider whether the area outside the fence might have qualified as part of the protected curtilage surrounding the home. Instead, the trial court appears to have simply assumed that the curtilage necessarily ended at the fence. The definition of the curtilage for fourth amendment purposes, however, is not so mechanical. The Supreme Court has expressly rejected the notion that the curtilage may automatically be determined with reference to the fence around a property. *Id.* at 1139 n. 4 ("We decline the Government's invitation to adopt a 'bright-line rule' that 'the curtilage should extend no farther than the nearest fence surrounding a fenced house.'"). Accordingly, we conclude that a factual inquiry, leading to a *Dunn*-type analysis, is required. Here, however, because the trial court ruled that appellant lacked standing as a matter of law, the court declined to conduct an evidentiary hearing. Consequently, the record is devoid of the factual findings necessary to determine whether the area from which the suitcase and shotgun were seized was inside or outside the curtilage of appellant's home.

**B.**

Appellant concedes that, if the area from which the suitcase containing the shotgun was seized is outside the curtilage, he has no protected fourth amendment interest in the suitcase and its contents, since he has not asserted an ownership interest in the suitcase or in the shotgun. The government argues, however, that even if these items were taken from within the protected curtilage of his home, this does not necessarily mean he may assert a fourth amendment interest in them. The government contends that although the occupant of a home is deemed, presumptively, to have a reasonable expectation of privacy in the area within the curtilage, not every item within the curtilage is subject to fourth amendment protection. The government's argument misapprehends the curtilage doctrine.

■ While it is true that the Supreme Court has upheld certain types of police intrusions into the curtilage, *see California v. Ciraolo*, 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) (aerial observation of area within the curtilage permitted), no exception to the general rule protecting the area within the curtilage from warrantless search and seizure applies in this case. As the government correctly points out, Officer Cook was not precluded from observing the area in which the suitcase was found, even if within the curtilage, since the suitcase was in public view. It does not follow, however, that merely because the suitcase was visible, the police could properly enter the curtilage (assuming, again, that the suitcase was within the curtilage) without a warrant to seize the suitcase and search its contents. Indeed, the concept of the curtilage would be of little meaning if the police were permitted to enter the curtilage at will to reach and seize whatever tangible items might be located there. Accordingly, if on remand the trial court concludes that the suitcase was taken from within the curtilage, evidence of the suitcase and its contents must be suppressed, and appellant will be entitled to a new trial. *See supra* note 5.

### III.

Appellant also contends that the adverse jury verdicts on charges involving Carlton Stewart and Rickie Marsh were not clearly unanimous. We have held:

> The constitutional right to a unanimous jury verdict, as set forth in the Sixth Amendment to the United States Constitution and Super.Ct.Crim.R. 31(a), "requires jurors to be in substantial agreement as to just what a defendant did as a step preliminary to determining whether that defendant is guilty of the crime charged."

*Burrell v. United States,* 455 A.2d 1373, 1379 (D.C.1983) (quoting *Johnson v. United States,* 398 A.2d 354, 369 (D.C.1979)). Here, the jury heard testimony from seven eyewitnesses, each of whom had seen the events somewhat differently. Their testimony, taken in various combinations, offered several possible scenarios under which the jury could have found appellant guilty of the assaults charged. The trial court and the parties recognized and resolved the unanimity issue with respect to the charge of assault with a pistol against Marcell Marsh. A similar unanimity issue existed, however, with respect to the charges of assault with a pistol against Carlton Stewart and against Rickie Marsh. Neither the parties nor the trial court recognized this second unanimity issue.

The government's complaining witnesses, Marcell Marsh, Rickie Marsh, and Carlton Stewart, each testified that appellant had fired the pistol twice: once immediately after he took the pistol from Hairston and again as he ran toward the alley. Appellant, to the contrary, testified that he had fired the pistol only once, in self-defense, as he ran away from the Marsh group. Donald Hairston also testified that appellant had fired only once. The government's neutral witnesses, who saw the altercation from their nearby homes, each testified about hearing a single shot.

Appellant suggests several possible scenarios upon which the jury may have relied, any one of which would have yielded guilty verdicts on the two charges of assault now challenged. First, the jury could have credited appellant's testimony that he had fired only once, but have discredited his claim of self-defense, yielding convictions of assault on both Rickie Marsh and Carlton Stewart based upon the evidence showing that appellant fired his shot in the direction of the, entire Marsh group. Second, the jury could have believed the government's witnesses' testimony that appellant had fired twice, then concluded that the first shot constituted an assault on both Rickie Marsh and Carlton Stewart (since the two stood just a few feet apart at that point), but accepted appellant's claim of self-defense as to the second shot, fired as he ran toward the alley. Third, the jury could have believed that appellant fired twice, without justification, (a) assaulting Rickie Marsh with the first shot and both victims with the second shot or (b) assaulting both victims with both shots.[6] We may rule out a particular possibility if we conclude that no reasonable jury would have accepted it. *Scarborough v. United States,* 522 A.2d 869, 874–75 (D.C.1987) (en banc). Based on the record, however, we conclude that a reasonable jury could have accepted any of the several scenarios outlined above. Accordingly, we hold that the trial court erred in failing to give a special unanimity instruction on the Stewart and Ricky Marsh assaults.

Contrary to the government's assertion on appeal, the record reveals no single, consistent scenario from which the jury necessarily found appellant's guilt. In *Scarborough,* we were able to infer from the verdicts that the jury, despite the absence of a special unanimity instruction, could not reasonably have accepted one part of the defendant's testimony while disbelieving the other critical portion. *Id.* Therefore, we concluded, the challenged

---

6. Appellant suggests this combination of facts as two separate scenarios. We treat the two together, however, since a finding that appellant assaulted both victims with both shots embraces the finding that the appellant, with the first shot, assaulted Rickie Marsh alone. The jury, therefore, could have disagreed as to whether the first shot constituted an assault on one or both, and still have rendered a unanimous verdict for sixth amendment purposes.

verdict must have been unanimous and the error in failing specially to instruct the jury was harmless beyond a reasonable doubt. Likewise, we recently held in *Shivers v. United States*, 533 A.2d 258 (D.C.1987), that reversal was not required, although no special unanimity instruction had been given, since the challenged jury verdict "appear[ed] to reflect unanimous agreement as to at least one of the possible bases for the assault charge." *Id.* at 262. Here, in contrast, there is no evidence to which we can point that indicates unanimous agreement among the jurors; we cannot deduce from the record whether the jury must have agreed upon one particular set of facts.

The possibility of jury confusion, moreover, is all the greater than in *Shivers* because appellant presented "distinct and sharply different defenses," *id.* at 263, to the alleged gunshots, whereas Shivers offered consistent denials of the assaults charged.[7]

Finally, although the trial court gave the jury the standard general unanimity instruction,[8] the court did not instruct the jury that it must unanimously agree upon a single factual scenario underlying its verdicts of guilty. *See Hack v. United States*, 445 A.2d 634, 641 (D.C.1982).[9] Consequently, we cannot infer from the verdicts themselves that all the jurors were in agreement as to appellant's specific criminal acts.

Because appellant made no objection to the court's instructions at the time of trial, we may reverse only upon a showing of plain error, that is, error so clearly prejudicial to substantial rights of the defendant as to jeopardize the very fairness and integrity of the trial. *Watts v. United States*, 362 A.2d 706, 709 (1976) (en banc). The error complained of here was of constitutional magnitude, violating appellant's sixth amendment right to a unanimous jury verdict. Although not every error of constitutional magnitude may rise to the level of plain error, *see Scarborough v. United States*, 496 A.2d 277, 282 & n. 11 (D.C.1985) (per curiam) (Ferren, J., concurring); *reheard en banc, Scarborough*, 522 A.2d 869, *supra*, we conclude that the sixth amendment right to a unanimous jury—a substantial right—was so clearly prejudiced by the confusion inherent in the separate defenses to the alleged gunshots, unaided by a special unanimity instruction, that plain error occurred. *Compare Barkley v. United States*, 455 A.2d 412, 416 (D.C.1983) (Ferren, J., concurring in part and dissenting in part), *with Scarborough*, 522 A.2d at 874–75. Accordingly, appellant's convictions of assault with a pistol on

---

**7.** In the present case, the government alleges two shots directed at various persons. Appellant contends, with respect to the first alleged shot, that no shot in fact was fired; with respect to the second shot, he argues self-defense. The potential for jury confusion inherent in his two separate defenses is obvious in the multiple factual scenarios that may be deduced from the evidence depending upon which, if any, of appellant's defenses the jury may have chosen to accept.

**8.** Specifically, the trial court instructed the jury that in reaching its verdict,

The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree to the verdict. *Your verdicts must be unanimous.*

(Emphasis added.)

**9.** In *Hack v. United States*, 445 A.2d 634·(D.C. 1982), we held that where, on the facts of the case, a potential unanimity problem presents itself, a special unanimity instruction may be required.

The requirement for a unanimous verdict, as set forth in the Sixth Amendment to the United States Constitution and Super.Ct.Cr.R. 31(a), "required jurors to be in substantial agreement as to just what a defendant did as a step preliminary to determining whether that defendant·is guilty of the crime charged." *United States v. Gipson*, 553 F.2d 453, 457–58 (5th Cir.1977), *quoted in Johnson v. United States*, [398 A.2d 354, 369 (D.C.1979) ]. Because of the possibility of a nonunanimous verdict, when one charge encompasses two separate incidents, the judge must instruct the jury that if a guilty verdict is returned the jurors must be unanimous as to which incident or incidents they find the defendant guilty. *Hawkins v. United States*, 434 A.2d 446 (D.C.1981).

*Id.* at 641. Had such an instruction been given in this case, the outcome might have been different. In the absence of such an instruction, however, we may not presume that the jury reached unanimous agreement on the underlying facts.

Rickie Marsh and Carlton Stewart must be reversed and remanded.[10]

## IV.

In accordance with this opinion, we reverse appellant's convictions for assault with a pistol on Rickie Marsh and Carlton Stewart on the ground that the jury verdicts on those charges were not clearly unanimous, and thus we remand for a new trial. With respect to the remaining convictions of assault with a pistol on Marcell Marsh and of carrying a pistol without a license, we remand for an evidentiary hearing on whether the shotgun introduced at trial was seized by police outside or inside the curtilage of appellant's home. Should the trial court conclude that the shotgun was taken within the curtilage, the court shall order the shotgun suppressed and, as a consequence, shall vacate appellant's remaining convictions and order a new trial on those counts. Otherwise, those two convictions shall stand. The judgment of the trial court, therefore, is hereby

*Reversed in part and remanded for further proceedings.*

---

**10.** In view of our holding, we need not reach appellant's contention that the challenged assault convictions merge. We note, however, that in the event appellant is retried on those counts, any two convictions arising from the firing of a single shot would merge on the facts of this case. *United States v. Alexander,* 152 U.S. App.D.C. 371, 381, 471 F.2d 923, 933, *cert. denied,* 409 U.S. 1044, 93 S.Ct. 541, 34 L.Ed.2d 494 (1972) (single act, directed to a group, constitutes a single offense, although more than one person is put in fear); *accord, Ladner v. United States,* 358 U.S. 169, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958).