**UNITED STATES of America**

**v.**

**Manuel Jose TARAZON–SILVA and Ricardo Belkotosky–Gutierrez.**

**No. EP–96–CR–656–DB.**

United States District Court,
W.D. Texas,
El Paso Division.

April 7, 1997.

Juanita Fielden, Margaret Leachman, Asst. U.S. Attys., El Paso, TX, for plaintiff.

Robert Ramos, Dick Deguerin, El Paso, TX, for defendants.

## MEMORANDUM OPINION AND ORDER

BRIONES, District Judge.

On this day, the Court considered Defendants Manuel Jose Tarazon–Silva and Ricardo Belkotosky–Gutierrez' Motion to Suppress Evidence, filed on January 21, 1997, in the above-captioned cause. The Government's Response was filed on February 13, 1997. On Tuesday, March 4, 1997, the Court held a hearing on the Motion. At the conclusion of the hearing, the Court directed the parties to file post-hearing arguments within ten days, which they did on March 14, 1997. In addition, both sides filed a Reply to their respective post-hearing arguments on March 21, 1997. After due consideration, the Court is of the opinion that this matter should be resolved as set forth below.

## FACTS

On September 19, 1996, at approximately 1:40 p.m., United States Customs Service ("USCS") Special Agent Gerardo Pineda ("Pineda") received information from a confidential informant ("CI") who stated that he had seen tape-wrapped bundles in the trunk of a silver-gray Chevrolet Lumina (the "Lumina"). The CI was of the opinion that the tape-wrapped bundles contained some type of narcotic drugs. Pineda relayed this information to Special Agent Jeff Pullig ("Pullig") of the Drug Enforcement Administration ("DEA"). The CI followed the Lumina to a residence located at 10910 Pelhem Road (the "Pelhem residence" or "house"), El Paso, Texas, where he was eventually joined by Pineda, and other agents, who maintained continuous surveillance on the residence.

At approximately 2:30 p.m., Pullig met with DEA Special Agents Mike Stokes ("Stokes"), Matt Mayfield ("Mayfield"), Salvador Martinez ("Martinez"), and USCS Special Agent Ofelia Amy Estrada ("Estrada") at the intersection of Montana Avenue and Lee Trevino Drive, in El Paso, Texas. Estrada informed the other agents that an individual ("Suspect 1" or "Tarazon") had driven the Lumina to a residence located at 10910 Pelhem Road. At approximately 2:55 p.m., Pullig and Stokes drove by the Pelhem house and observed that it was a stucco duplex. They observed no activity at that time. At approximately 3:05 p.m., Pullig contacted Pineda by cellular telephone. Pineda informed Pullig that the individual driving the Lumina had arrived at the Pelhem house, and had departed shortly afterwards. USCS agents followed the Lumina when it left the Pelhem residence. Pineda requested that Pullig meet Pineda at the Furr's Supermarket parking lot located at the intersection of Pebble Hills and Lee Trevino Drive. Pullig accompanied Estrada, in Estrada's USCS vehicle, to the Furr's Supermarket so that contact between the USCS and the DEA could be maintained.[1]

---

1. The United States Customs Service and the Drug Enforcement Administration were not able to communicate by radio because the programmed radio frequencies used by the USCS and the DEA are different. Contact was main-

Pullig and Pineda met at approximately 3:10 p.m. in the Furr's Supermarket parking lot. Pineda told Pullig that the individual driving the Lumina left the Pelhem residence at approximately 2:50 p.m. and drove to the parking lot in which the agents were currently standing. The individual was observed talking into what appeared to be a hand-held radio as he approached the bank of pay phones located on the exterior wall of the Furr's Supermarket. The individual made a phone call from one of the pay phones. At the conclusion of that call, the individual stood near the pay phones and waited. He appeared to be looking for someone. Within minutes, another individual ("Suspect 2" or "Belkotosky") arrived at the pay phones. Both individuals left the pay phone area and approached a white Ford pick-up truck (the "Ford"). The individuals departed the parking lot in the Ford, with Suspect 1 driving and Suspect 2 in the front passenger seat. Pineda observed that the Lumina was left behind in the Furr's parking lot.

USCS Special Agents Cynthia Mandujan ("Mandujan"), Manny Olmos ("Olmos") and Jorge Balderamma ("Balderrama") maintained surveillance on the Ford after it exited the Furr's parking lot. Pineda and USCS Special Agent Mark Miller ("Miller") remained at the parking lot in order to continue surveillance on the Lumina.

Mandujan, Olmos and Balderramma followed the Ford pick-up to a business located at 11045 Rojas Drive #8, El Paso, Texas. Suspect 2 exited the Ford at that address. The agents then followed Suspect 1, still driving the Ford pick-up, to a residence located at 1903 Bay City Place, El Paso, Texas. Suspect 1 parked the Ford at the curb in front of the residence and waited for approximately twenty minutes before Suspect 2 arrived driving a red Ford Thunderbird bearing license plates issued by the Republic of Mexico. Suspect 2 entered the residence, remained for a brief time, exited the house

and entered the Ford pick-up truck being driven by Suspect 1. The red Ford Thunderbird was left parked in the driveway of the Bay City Place residence. Mandujan, Olmos and Balderrama then followed the Ford pick-up to a residence located at 11200 Seaview Avenue, El Paso, Texas. One of the individuals left the Ford and entered the house. The agents were not able to determine which individual went into the house and which remained in the pick-up. Shortly thereafter, the individual exited the residence and returned to the Ford pick-up. The Ford then proceeded, followed by Mandujan, Olmos and Balderrama, to the south side of a Furr's Supermarket parking lot. This was the same parking lot in which the two individuals had rendezvoused earlier, and which still contained the Lumina. Suspect 2 exited the Ford pick-up directly behind the Lumina and headed towards the Lumina.

As Suspect 2 began opening the driver's side door of the Lumina, Mayfield exited Stokes' official vehicle, identified himself as a DEA agent, and ordered Suspect 2 to get down on the ground. Mayfield's orders to Suspect 2 were delivered in an extremely loud voice designed to secure immediate compliance with said orders. During the course of these events, Mayfield's weapon was drawn and he was holding it in what is known as a "cover scan" position.[2] Suspect 2 raised his hands, dropped a small, dark colored bag that he had been carrying, and laid down on the asphalt parking lot. Agent Stokes (having parked his vehicle) approached the scene and "covered" the suspect with his weapon. Mayfield checked the bag, which had been dropped by Suspect 2, for weapons. After feeling the bag, and then looking inside, Mayfield discovered a Motorola radio, a ring of keys, and some documents.[3] Other agents began arriving on the scene. In all, approximately 4 to 5 agents were present around the Lumina at this time. Suspect 2 was advised of his rights, in

---

tained between the groups by means of cellular telephone.

**2.** Mayfield's weapon was a Sig Sauer P–228. 9 millimeter. A "cover scan" position is a position in which the weapon is pointed approximately at the suspect's thighs such that the agent has a

clear view of both the suspect and the surrounding area and can immediately bring his weapon to bear, should that become necessary.

**3.** The Court notes that no weapons were found in the bag or on Suspect 2's person.

Spanish, by Olmos. Agent Stokes, with Olmos interpreting, inquired as to whether the keys from the bag belonged to Suspect 2. Suspect 2 responded that he did not know who owned the keys. Stokes then asked if the keys belonged to the Pelhem residence and Suspect 2 stated that he was not aware of any such residence located on Pelhem Road.

As the arrest of Suspect 2 was occurring, Estrada and Pullig were following Suspect 1 as he prepared to depart the Furr's parking lot in the white Ford pick-up truck. As Suspect 1 attempted to exit the parking lot onto Lee Trevino Drive, several agents blocked the parking lot exit with their vehicles. The agents had their weapons drawn, identified themselves as law enforcement agents, and ordered Suspect 1 to place his hands against his vehicle. Again, this was accomplished by shouting the orders at the suspect. Suspect 1 was advised of his rights, in Spanish, by Estrada. One of the agents performed a "pat down" search of Suspect 1. No weapons were found. When asked what he was doing in El Paso, Suspect 1 responded that he was from Phoenix, Arizona, and was in El Paso visiting a friend. He further stated that he had been in El Paso for only a couple of days. Upon being asked the name of his friend, Suspect 1 stated that he did not know the name of the friend or the friend's address. Pineda then asked Suspect 1 what he was carrying in the front pocket of his pants. The response was "keys." Pineda asked to look into the pocket and received permission to do so. Pineda retrieved one set of keys, and then inquired as to the purpose of the keys. Suspect 1 responded that the keys fit the lock at his home in Arizona.

Pineda took the keys from Suspect 1 and, *inter alia*, asked if he knew Suspect 2. Suspect I denied knowing Suspect 2. After several other questions, Suspect 1 stated that he had just met Suspect 2 at the bank of pay phones on the wall outside the Furr's Supermarket. After receiving permission to call his wife in Arizona, Suspect 1 indicated that he no longer wished to answer any questions. At this time, Pineda apparently took the two sets of keys, one set from each suspect, and

compared them. Pineda and Stokes felt that the keys matched. At that point, either Pineda or Stokes gave the keys to Martinez with instructions that Martinez should attempt to discover whether the keys fit the door locks at the Pelhem residence.

At approximately 4:30 p.m., Martinez and a few other agents went to the Pelhem residence. Martinez parked his official vehicle at the curb and walked up the sidewalk to the house. As he approached the house, Martinez noticed a waist-high wrought iron fence which extended between the two garages of the duplex. Martinez passed through an open gate in the fence. The gate was next to the Pelhem residence garage, and was approximately the width of the sidewalk. The gate would have blocked the approach to the residence had it been in a closed position.

Martinez rang the doorbell of the house and then proceeded to knock on a wrought iron security door. The wrought iron security door was set in place in the door jamb and protected the main wooden door of the residence. No one responded to the ringing bell, which Martinez could hear through the door, or the persistent knocking. In an attempt to knock louder, Martinez opened the wrought iron security door, which was not locked, and knocked on the wooden door. Again, there was no response. During this period, Martinez asked "Is anybody home?" and said "Police" in a loud voice in both English and Spanish. There was no response.

Next, pursuant to the instructions given to him by Pineda and Stokes, Martinez inserted a key from one of the key rings taken from the suspects into the dead bolt lock in the wooden door. This was the top-most lock in the wooden door. The key "clicked" as Martinez turned it in the lock, unlocking the deadbolt. Martinez re-locked the deadbolt, and then tried the same thing with one of the keys from the ring of keys taken from the other suspect. Again, the key unlocked the door. At no time did Martinez open the door or enter the residence. Martinez informed Pineda that the keys fit the lock. and Pineda, in turn, called Stokes on a cellular phone and advised him that the keys fit the lock at the house.

Earlier that same day, at approximately 2:00 p.m., Pineda had notified USCS Canine Enforcement Officer Joseph Ledesma ("Ledesma") that Ledesma and his canine ("Shades") should report to the 7–Eleven located at the intersection of Montana Avenue and Lee Trevino Drive, El Paso, Texas, and remain on "standby." At approximately 4:00 p.m., Pineda summoned Ledesma and Shades to the Furr's Supermarket parking lot.

Shades was first "run" on the white Ford pick-up truck. The record is unclear as to whether Ledesma ran Shades on the exterior of the pick-up and whether Shades "alerted" to that area of the vehicle. However, it is very clear that Ledesma opened the doors to the Ford pick-up and had Shades thoroughly sniff the interior of the vehicle. Shades aggressively alerted to the presence of narcotics on the driver's side floorboard. No drugs were found in the white Ford pick-up.

Next, Shades was "run" on the Lumina. Again, the record is unclear as to whether Ledesma ran Shades on the exterior of the Lumina and whether Shades alerted to that area of the vehicle. However, Shades was run on the interior of the Lumina, and he aggressively alerted to the driver's side dashboard area, the front passenger side of the vehicle, and the opened trunk. Again, however, no drugs were found in the Lumina.

After both suspects were in custody, Special Agent Michael Stokes returned to the vicinity of the residence located at 10910 Pelhem Road and interviewed people who resided in the neighborhood. He determined that an individual fitting the description of Suspect 1 had been seen at the Pelhem residence for approximately the last-six months. Neighbors also related that a white Ford pick-up truck. a silver-gray Chevrolet Lumina, and a red Ford Thunderbird had been seen on occasion at the Pelhem residence. Finally, neighbors related that vehicular traffic at the residence was frequent and irregular, and that the hours maintained by those living in the house were also irregular.

Based upon the information from the CI and the neighbors, the surveillance of the suspects, the alerts on the vehicles by the canine, and the matching of the keys taken from the suspects, Agent Stokes left the area to begin preparing an application for a search warrant for the Pelhem residence.

While Agent Stokes was preparing the search warrant application, Ledesma and Shades were ordered to the Pelhem residence. Ledesma approached the house by way of the sidewalk and began to "run" Shades on the exterior of the residence, starting at the bottom left corner of the garage door and proceeding right. At the front of the garage Shades alerted, *albeit* not aggressively, to the odor of narcotics. Ledesma continued running Shades on the exterior of the residence, remaining on the driveway. At the far right corner of the house, Ledesma and Shades turned left and continued along the side of the house on a paved area which was connected to the driveway. This area appears to be almost wide enough to accommodate a parked car. Shades aggressively alerted to the odor of narcotics at a dryer vent attached to the residence.[4] The vent is located approximately midway between the corner of the garage and a gate which provides access to the backyard of the residence. At no time during these events did Ledesma and Shades enter the area fenced off at the front of the residence or the back yard which was protected by a closed gate.

At approximately 10:00 p.m. that evening, Magistrate Judge Richard P. Mesa signed a search warrant authorizing a search of 10910 Pelhem Road. The search resulted in the seizure of approximately 2,232 pounds of cocaine, two pounds of marijuana, and documentary evidence.

On September 23, 1996, Stokes returned to the residence located at 1903 Bay City Place, El Paso, Texas. This was one of the locations where the suspects had been surveilled on September 19, 1996. Stokes approached the front door with the intent of determining whether anyone was currently at the resi-

---

4. Shades' alert was so aggressive that his pawing and scratching caused some visible damage to the plastic dryer vent.

dence. No one was home. Stokes and other DEA agents conducted several interviews in the Bay City Place neighborhood. They learned from one neighbor that a man and a woman had recently bought the house at 1903 Bay City Place. The neighbor informed the agents that, according to the former owner of the house, the man and the woman had purchased the residence with cash. In addition, they learned that an individual fitting the description of Suspect 2 was the only person recently seen by the neighbors at the house. The man and woman who had purchased the dwelling had not been seen for approximately one year.

Another neighbor related that there was a great deal of vehicular traffic to and from the house, and that several of those vehicles bore license plates issued by the Republic of Mexico. The vehicles seen at the residence included, among others, a white Ford pick-up truck and a red Ford Thunderbird. Finally, Stokes determined, apparently by testing the keys on the front door lock, that the keys taken from Suspect 2 at the time of his arrest matched the locks on the door to the residence at 1903 Bay City Place.

On September 23, 1996, at 11:30 p.m., Magistrate Judge Michael S. McDonald signed a search warrant authorizing a search of the residence located at 1903 Bay City Place, El Paso, Texas. Among the items seized from the house was approximately $30,151.00 in cash.

As noted above, the suspects were also surveilled at a warehouse located at 11045 Rojas Drive, El Paso, Texas, on September 19, 1996. On November 19, 1996, Mayfield conducted an interview with the property manager for the warehouse. The property manager informed Mayfield that, as of that date, the rent for storage area # 8, which Suspect 2 was seen entering on September 19, 1996, was two months past due. The property manager volunteered that he had begun eviction proceedings against Grupo Orma, the party who had leased units # 7 and # 8. Upon interviewing the individual who receives the rent on behalf of the prop-

erty manager, Mayfield learned that a person fitting the description of Suspect 1 was one of the individuals who had in the past paid the rent for units # 7 and # 8. The rent had always been paid in cash. This individual also informed Mayfield that the units appeared to have been abandoned and empty since September, the last month for which rent was paid.

On November 26, 1996, Magistrate Judge Richard P. Mesa signed a search warrant authorizing a search of units # 7 and # 8 in the warehouse located at 11045 Rojas Drive, El Paso, Texas. During the execution of the search warrant, the agents discovered packaging material which appeared to match the material in which the cocaine was wrapped, and other documentary evidence.

## DISCUSSION

The U.S. Supreme Court has recognized essentially three types of police-citizen encounters. The first is a consensual encounter which does not implicate the Fourth Amendment.[5] *Florida v. Rodriguez*, 469 U.S. 1, 5, 105 S.Ct. 308, 310–11, 83 L.Ed.2d 165 (1984); *United States v. Cooper*, 43 F.3d 140, 145 (5th Cir.1995).

The second type of police-citizen encounter is an investigatory stop or detention, most commonly known as a *Terry* stop. This form of encounter is limited to a brief, non-intrusive detention which must be supported by a reasonable suspicion of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In order to justify the "reasonableness" standard, an officer is required to provide specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant an intrusion. *Id. See also United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). A reasonable suspicion is determined from the "totality of the cir-

---

**5.** The consensual encounter is not at issue in this case as neither Defendant consented to a search of any kind.

cumstances," *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), and from the collective knowledge of the officers involved in the stop. *United States v. Shaw,* 701 F.2d 367, 377 (5th Cir.1983) (*citing United States v. Cimino,* 631 F.2d 57 (5th Cir. 1980)). In addition, reasonable suspicion may be based upon personal observation or information provided by a confidential informant, if the information from the informant possesses an indicia of reliability. *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *United States v. Wangler,* 987 F.2d 228 (5th Cir.1993). In examining the totality of the circumstances, "the informant's veracity, reliability, and basis of knowledge ... [are] important factors; however, a deficiency in one [of the indicia of reliability] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or some other indicia of reliability. *United States v. Roch,* 5 F.3d 894 (5th Cir.1993); *United States v. Jackson,* 818 F.2d 345 (5th Cir.1987) (*citing Gates,* 462 U.S. at 238, 103 S.Ct. at 2332).

Finally, the third and most intrusive type of police-citizen encounter is an outright arrest. Such an encounter is considered reasonable only if it is supported by probable cause. *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). The standard for probable cause is much more stringent than that for reasonable suspicion. *United States v. Greer,* 939 F.2d 1076 (5th Cir.1991). *See also United States v. Maldonado,* 735 F.2d 809 (5th Cir.1984); *United States v. Head,* 693 F.2d 353 (5th Cir.1982); *United States v. Petty,* 601 F.2d 883 (5th Cir.1979). Probable cause exists when the officer knows facts and circumstances which would be sufficient to cause an officer of reasonable caution to believe that the person about to be arrested has committed, is committing, or is about to commit a crime. *United States v. Carrillo–Morales,* 27 F.3d 1054 (5th Cir.1994); *United States v. De Los Santos,* 810 F.2d 1326 (5th Cir.1987). A warrantless arrest or search is presumptively unreasonable, and it is therefore the responsibility of the Government to show the exis-

tence of probable cause for such an arrest or search. *United States v. Ho,* 94 F.3d 932 (5th Cir.1996). The "totality of circumstances" test set forth in *Gates,* noted above, also applies to the determination of probable cause. *United States v. Buchanan,* 70 F.3d 818, 826 (5th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 1340, 134 L.Ed.2d 490 (1996). Finally, probable cause may not be based upon observations and facts learned after the arrest. *United States v. Tinkle,* 655 F.2d 617, 623 (5th Cir.1981).

The Court will first address the facts of this case in light of the standards set forth for a *Terry* stop, specifically, the standard for reasonable suspicion. The Government asserts that the agents had both a tip from a reliable informant and personal observations which were sufficient to create a reasonable suspicion that "criminal activity was afoot." *See Terry,* 392 U.S. at 30, 88 S.Ct. at 1884–85. This Court disagrees.

It is true that the Government had a tip from a reliable informant.[6] However, the CI told Pineda that he had seen "tape-wrapped bundles" in the trunk of a silver-grey Chevrolet Lumina, and that the appearance of the bundles was consistent with the manner in which drug smugglers packaged narcotics. The problem is that the CI *did not* state that he had seen narcotics in the vehicle—he saw only bundles that he thought *might* contain narcotics. In other words, the CI "saw what he saw," and what he saw was something which might or might not be narcotics. Obviously, something more is necessary.

That "something more," according to the Government, is the actions of the Defendants on September 19, 1996. Agents of the USCS and the DEA observed the suspects placing telephone and radio calls to unknown individuals. The suspects were observed traveling to and from various locations in a silver-gray Chevrolet Lumina and a white Ford pick-up truck. They met at least twice in a Furr's Supermarket parking lot in east El Paso and traveled to a warehouse and the other residences mentioned above. This Court is of the opinion that the aforementioned actions of the suspects on September 19, 1996, were

---

**6.** This Court has no doubt regarding the CI's    reliability.

just as consistent with legal activity as they might be with illegal activity. The suspects were not observed committing any crime whatsoever, including minor traffic violations. The actions of the Defendants, when combined with the CI's tip, do not provide the reasonable suspicion necessary to conduct a *Terry* stop.

It is not necessary for the Court to reach the issues presented by the manner in which the stop was conducted because, considering the totality of the circumstances, the agents did not possess specific and articulable facts which reasonably warranted an intrusion. It is also unnecessary for the Court to determine whether the agents had probable cause to stop the Defendants. As noted above, probable cause is a much more stringent standard than reasonable suspicion, and because the agents lacked even a reasonable suspicion to support the stop, they obviously lacked probable cause. Finally, the Court need not address the issues presented by the searches of the Chevrolet Lumina and the white Ford pick-up truck because, without the stop, there would not have been any searches of the vehicles.

Accordingly, the stops of the Chevrolet Lumina and the white Ford pick-up truck must be suppressed. Additionally, all information gained as a result or "fruit" of those stops must also be suppressed. Said information includes the identities of the Defendants, the statements made by the Defendants at the time of their arrests, the searches of the Lumina and the Ford pick-up truck, and the matching of the keys taken from the Defendants.[7]

■ Next the Court turns to the search of the Pelhem residence. The Fifth Circuit has established a two step analysis for determining the admissibility of evidence obtained pursuant to a search warrant. *United States v. Satterwhite,* 980 F.2d 317 (5th Cir.1992). First, a court must determine whether the "good faith" exception to the exclusionary rule applies. *Id.* at 320. If the good faith exception does apply, the court need not reach the second step—probable cause. *Id; United States v. Garcia,* 27 F.3d 1009, 1012

(5th Cir.), *cert. denied, sub nom. Chavez v. United States,* —— U.S. ——, 115 S.Ct. 531, 130 L.Ed.2d 435 (1994).

■ The "good faith" exception was initially recognized in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). This exception exempts from the exclusionary rule evidence seized by law enforcement officers who act in objective good faith reliance on facially valid search warrants issued by neutral and detached magistrates. *Id.* The good faith exception was designed to protect police officers who are generally not schooled on the finer nuances of the law and who therefore should not be held accountable for a magistrate's blunder. *See generally Gates,* 462 U.S. 213, 103 S.Ct. 2317. However, the good faith exception is not a "cure all" for agents to use in the event of a deficient search warrant. By its very nature, the good faith exception is just that— an *exception* to the exclusionary rule. The obvious inference is that the exclusionary rule applies unless the Government is able to show that the agents were acting in good faith reliance on a facially valid search warrant. Absent such a showing, the good faith exception does not apply.

The Supreme Court has detailed four circumstances where the good faith exception does not apply, and where suppression remains the appropriate remedy. They are: (1) if the issuing magistrate acted in reliance on a deliberately or recklessly false affidavit; (2) if the issuing magistrate wholly abandoned his judicial role and failed to act in a neutral and detached manner; (3) if the search warrant was predicated on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or, (4) if the search warrant was so facially deficient (i.e. by failing to describe the place to be searched and things to be seized) that the officer could not reasonably presume it to be valid. *Leon,* 468 U.S. at 923, 104 S.Ct. at 3420–21.

■ In this instance, the Defendants argue that the affidavit for the Pelhem resi-

---

7. This includes the matching of the sets of keys, by the agents, at the scene of the arrest, and the

insertion of the keys into the deadbolt lock at the Pelhem residence.

dence search warrant contained tainted and misleading information and conclusory allegations, and that the agent attempted to "hoodwink" the magistrate into signing the warrant. However, after hearing the testimony presented at the suppression hearing, and after reviewing all of the briefs submitted by the parties, including the Pelhem affidavit, this Court has determined that none of the circumstances outlined· in *Leon* are present in this case so as to vitiate good faith reliance. None of the information contained in the affidavit was either deliberately or recklessly false; the magistrate did not abandon his judicial role, nor did he fail to act in a detached and neutral manner; the affidavit was not lacking in the indicia of probable cause; and the affidavit was not facially deficient. Under normal circumstances, this would tend to indicate that the good faith exception should apply. However, the circumstances in this case were not what this Court would classify as "normal."

The discriminating factor in this case, at least as far as the good faith exception is concerned, is that the agent preparing the application for the search warrant and the affidavit was assisted by an Assistant United States Attorney ("AUSA"). The testimony at the suppression hearing unequivocally established that the application for the search warrant (including the affidavit) was presented to the duty magistrate on the instructions and authority of the duty AUSA, an individual obviously aware of the finer nuances of the law. As noted earlier, the good faith exception was designed to protect police officers who are generally not schooled on the finer nuances of the law. *See generally Gates*, 462 U.S. 213, 103 S.Ct. 2317. An AUSA is not a person the good faith exception is intended to protect. As a result, this Court is of the opinion that the Government may not rely on the good faith exception under the facts of this case.

■ In light of the Court's determination as to the inapplicability of the good faith exception, the Court must now undertake a thorough examination of the second step set forth in *Satterwhite*, specifically, whether the Pelhem affidavit was supported by probable cause.

The Government asserts that probable cause to search the residence located at 10910 Pelhem Road is supported by, *inter alia*, (1) the tip from the CI; (2) the observations of the agents during the surveillance of the residence and the suspects; and, (3) Shades' aggressive alert to the odor of narcotics at the dryer vent.

The Court notes that when making a probable cause determination with respect to the issuance of a search warrant, a magistrate must make a practical, common-sense decision as to whether, given all of the circumstances set forth in the affidavit, there is a fair probability that evidence of a crime will be found in a particular place. *United States v. McCarty*, 36 F.3d 1349 (5th Cir.1994) (*citing United States v. Byrd*, 31 F.3d 1329 (5th Cir.1994)). Further, a magistrate's probable cause determination is entitled to great deference. *United States v. Marbury*, 732 F.2d 390 (5th Cir.1984). However, when the magistrate's determination is based upon tainted information, that· determination clearly must be re-examined.

Therefore, the question with which this Court must now grapple is whether, after excising all of the tainted information gleaned from the aforementioned bad stops, the search warrant affidavit for the Pelhem residence exhibits sufficient probable cause. *See United States v. Restrepo*, 966 F.2d 964 (5th Cir.1992). After excising the tainted information, the following information relative to the Pelhem residence remains:

1) a description of the affiant's experience;

2) information provided by the CI as to the Pelhem residence as well as a description of the CI's credibility and basis for knowledge;

3) surveillance of the Pelhem residence;

4) surveillance of a silver-gray Chevrolet Lumina at Pelhem residence, said vehicle registered to Santiago Guzman at 14949 Grizzly Bear, El Paso, Texas;

5) surveillance of the two suspect individuals in the Furr's Supermarket parking lot;

6) surveillance of the two suspect individuals while they drove a white Ford pick-

up truck to other residences and a warehouse, said truck registered to Robert Rosson at 1501 Lomaland, El Paso, Texas;

7) observation of Suspect 2 entering the Lumina;

8) observation of cardboard boxes at the Pelhem residence which were consistent with the packaging of narcotics;

9) canine "sniff" of the dryer vent at the Pelhem residence; and,

10) interviews with neighbors establishing Suspect 1 at the Pelhem residence for approximately the last six months.

This Court is of the opinion that the "excised affidavit" does contain probable cause sufficient to support the search warrant.

The testimony at the suppression hearing established that Pineda has known the CI for approximately eight years. Additionally, the CI provided Pineda with information, in the past, which has resulted in several seizures of both narcotics and currency. Finally, it was established that the CI was familiar with the appearance of packaged cocaine and drug smuggling operations in general. This Court finds both the CI and his information to be reliable.

In response to the CI's information, agents from the USCS and the DEA established surveillance at the Pelhem residence. During the surveillance, the agents observed a Chevrolet Lumina at the Pelhem residence. Texas registration records revealed that the vehicle was registered to Santiago Guzman of 14949 Grizzly Bear, El Paso, Texas. The Lumina departed from the residence and went to a Furr's Supermarket parking lot located at 1840 North Lee Trevino Drive, El Paso, Texas. The driver made at least one telephone call at a bank of public pay telephones located on the wall outside the entrance-to the supermarket. Another individual approached the driver, they spoke, and

then they departed from the parking lot in a white Ford pick-up truck. Texas registration records revealed that-the Ford pick-up was registered to Robert Rosson of 1501 Lomaland, El Paso, Texas. The Ford pick-up truck was followed to a business located at 11045 Rojas Drive, to a residence located at 1903 Bay City Place, to a residence located at 11200 Seaview Avenue, and back to the Furr's Supermarket parking lot.[8]

Additionally, the agents spoke with several of the Pelhem house neighbors. They learned that an individual fitting Suspect 1's description had been living at the Pelhem house for approximately six months. They also discovered that vehicular traffic and the hours kept by the individuals at the residence were quite irregular. Finally, the Lumina, the white Ford pick-up truck and the red Ford Thunderbird had all been seen at the Pelhem residence.

Based upon all of the foregoing information, the agents summoned a narcotics-sniffing canine to the Pelhem residence. Not coincidentally, the canine and its handler turned out to be Shades and Ledesma, the very same team who had performed the search on the two vehicles in the Furr's parking lot.

A multitude of cases have arisen in recent years regarding the admissibility of evidence obtained as the result of a "sniff" by a trained narcotics detector dog.[9] "From these cases, one proposition is clear and universally accepted: if the police have some basis for suspecting an individual of possessing contraband, they may, consonant with the Fourth Amendment, use a drug detecting dog to sniff checked luggage, shipped packages, storage lockers, trailers, or cars." *Horton v. Goose Creek I.S.D.*, 690 F.2d 470, 476 (5th Cir.1982) (*citations omitted*). Additionally, courts have upheld a warrantless dog sniff of the exterior of a commercial warehouse, *United States v. Lingenfelter*, 997

---

**8.** The entire sequence of events which occurred during the surveillance is set forth in exacting detail in the "Facts" section of this Order.

**9.** *See, e.g. Horton v. Goose Creek I.S.D.*, 690 F.2d 470 (5th Cir.1982); *United States v. Johnson*, 660 F.2d 21 (2nd Cir.1981); *United States v. Viera*, 644 F.2d 509 (5th Cir.1981); *United States v.*

*Goldstein*, 635 F.2d 356 (5th Cir.1981); *United States v. Sullivan*, 625 F.2d 9 (4th Cir.1980); *United States v. Klein*, 626 F.2d 22 (7th Cir.1980); *United States v. Burns*, 624 F.2d 95 (10th Cir. 1980); *United States v. Solis*, 536 F.2d 880 (9th Cir.1976).

F.2d 632 (9th Cir.1993), a warrantless dog sniff of an exterior motel room door opening onto a public sidewalk and parking lot, *United States v. Marlar*, 828 F.Supp. 415 (N.D.Miss.1993), and a warrantless dog sniff of an Amtrak sleeper car, *United States v. Colyer*, 878 F.2d 469 (D.C.Cir.1989).

The majority view in the United States is that the sniffing of objects by a narcotics detector dog is not a search. *Horton*, 690 F.2d at 476. The Fifth Circuit has stated, in no uncertain terms, that a dog "sniff" is not a search. *United States v. Seals*, 987 F.2d 1102, 1106 (5th Cir.1993). In effect, the Courts have created a "public smell" doctrine which is analogous to the "plain view" doctrine. *Horton*, 690 F.2d at 477. *See also United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) (*implicit*); *United States v. Rivera*, 595 F.2d 1095 (5th Cir.1979) (*implicit*). In other words, if a police officer, positioned in a place where he has a right to be, recognizes the odor of, for example, marijuana, no search has occurred. The emanation of an odor from a person or property is considered to be exposed to the public "view" and, therefore, not protected. *Horton*, 690 F.2d at 477. The courts have determined that the sniffing by a canine is no different in that it simply enhances the olfactory sense of a police officer in the same way that a flashlight enhances the officer's sight. *Id. See also United States v. Ishmael*, 48 F.3d 850 (5th Cir.1995) (permissible to use thermal imager to monitor heat emissions from residence). Finally, a positive alert to the odor of narcotics by a reasonably reliable narcotics detector dog provides the police with probable cause to search the area in question. *Seals*, 987 F.2d at 1107; *United States v. Dovali–Avila*, 895 F.2d 206, 207 (5th Cir.1990).

■ Here, Shades was "run" along the side of the Pelhem residence where he aggressively alerted to the dryer vent. Based upon the testimony elicited at the suppression hearing, it is undisputed that Shades was a reasonably reliable narcotics detector dog. This Court is convinced that Shades' "sniff" of the Pelhem residence dryer vent was not a search if Ledesma and Shades had a right to be positioned alongside the resi-

dence, next to the vent, at the time that Shades alerted to the odor of narcotics.

The Fourth Amendment provides in part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. Amend. IV. It is well settled in this country that the Fourth Amendment provides significant protection to homes and the areas immediately attached to and surrounding them. *See, e.g., United States v. Dunn*, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987); *Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). Those areas immediately attached to and surrounding a home are referred to as the "curtilage." Curtilage is a valuable concept for use in determining the "reach" of the Fourth Amendment. *Dunn*, 480 U.S. at 300, 107 S.Ct. at 1139. In *Dunn*, the Supreme Court closely examined the "curtilage" issue and determined that the primary focus should be whether the area is "so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.* at 301, 107 S.Ct. at 1140. In an attempt to aid the lower courts in making such a determination, the Supreme Court established four factors which must be considered. They are: (1) the proximity of the area to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and, (4) the steps taken to protect the area from the observations of passersby. *Id.* at 302, 107 S.Ct. at 1140. The Court went on to indicate that consideration of these factors does not necessarily produce a dispositive result. They are simply an analytical tool to be used only to the extent that they bear on the "centrally relevant consideration—whether the area is so intimately tied to the home itself that it should be placed under the home's 'umbrella of Fourth Amendment protection'." *Id.* at 301, 107 S.Ct. at 1140. The *Dunn* factors must also be examined with reference to the obvious attributes of an urban environment. *Horton v. United States*, 541 A.2d 604, 608 (D.C.App.1988). A court must accord substantial weight to the use to which an individual puts his real estate in an urban environment. *Id.* The use of the prop-

erty is likely to be the most significant way in which someone would assert an intimate tie to the residence. *Id.* Further, it has been held that areas such as driveways, which are readily accessible, are not accorded the same degree of Fourth Amendment protection as is the interior of a residence. *See, e.g., Krause v. Penny,* 837 F.2d 595 (2nd Cir. 1988); *United States v. Reed,* 733 F.2d 492 (8th Cir.1984); *United States v. Ventling,* 678 F.2d 63 (8th Cir.1982); *United States v. Magana,* 512 F.2d 1169 (9th Cir.1975).

In this case, the dryer vent is obviously in close proximity to the home, indeed, it is physically attached to the home. However, the dryer vent is not included within an enclosure surrounding the home. As noted earlier, it is located approximately midway along the outside right wall of the residence. The area is paved and attached to the driveway of the residence. It is not in an enclosed area, and appears to be readily accessible to neighbors, visitors, repairmen, salesmen, utility workers, and/or members of the public. Additionally, as noted above, the area appears to be almost wide enough to accommodate a parked car. Further, even considering the residence's urban location, it does not appear that the area has been put to any use whatsoever, other than as an extension of the driveway. Last, but not least, there were no apparent attempts taken by anyone, let alone a resident, to protect the area from observation or access by passersby.[10]

Therefore, this Court finds that Ledesma and Shades were positioned in an area where they lawfully had a right to be. Consequently, Shades' sniff and subsequent alert to the scent of narcotics emanating from the dryer vent did not constitute a search. In light of the totality of the circumstances surrounding the search of the Pelhem residence, and after having excised all tainted information from the affidavit, this Court is of the opinion that the Pelhem affidavit contained sufficient probable cause to support the issuance of the search warrant.

Finally, the Court finds that the subsequent searches of the residence at 1903 Bay City Place and the warehouse at 11045 Rojas Drive, El Paso, Texas, were a direct result of the surveillance of the suspects and information obtained from the search of the Pelhem residence. To the extent that the affidavits supporting the search warrants for the Bay City Place residence and the Rojas Drive warehouse contained information obtained as a result of the stops of the vehicles, as detailed above, the Court is of the opinion that any such inclusion of information is minor and does not in any way affect the validity of the affidavits for those searches.

Accordingly, **IT IS HEREBY OR-DERED, ADJUDGED,** and **DECREED** that Defendants' Motion to Suppress Evidence is **PARTIALLY GRANTED.**

**IT IS FURTHER ORDERED** that evidence obtained from the stops of the Chevrolet Lumina and the white Ford pick-up truck is **SUPPRESSED.** Further, all information gained as a result or "fruit" of those stops is also suppressed. Said information includes the identities of the Defendants, the statements made by the Defendants at the time of their arrests, the searches of the Lumina and the Ford pick-up truck, and the matching of the keys taken from the Defendants.

**IT IS FURTHER ORDERED** that the Defendants' Motion to Suppress Evidence as to the Pelhem residence is **DENIED.**

**IT IS FURTHER ORDERED** that the Defendants' Motion to Suppress Evidence as to the Bay City Place residence and the Rojas Drive warehouse is **DENIED.**

---

10. The Government urges the Court to consider *United States v. Dickson,* 58 F.3d 1258 (8th Cir. 1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 747, 133 L.Ed.2d 695 (1996), wherein the court held that the burden of establishing a legitimate expectation of privacy in the area searched lies with the defendant. In order to do that, a defendant must show that he had a "reasonable expectation of privacy" in the area searched and that society would be prepared to accept his expecta-tion of privacy as "objectively reasonable." *Dickson,* 58 F.3d at 1264. In order to meet the first part of the test, the defendant must demonstrate by his conduct, that he sought to preserve the attached area as private. *Id. (quoting United States v. Stallings,* 28 F.3d 58, 60 (8th Cir.1994)). The Court need not address this argument as it has already been determined that a dog sniff is not a search.