881 So.2d 587 (2004)
STATE of Florida, Appellant,
v.
James RABB, Appellee.
No. 4D02-5139.
District Court of Appeal of Florida, Fourth District.
June 23, 2004.
Rehearing Denied September 22, 2004.
*588 Charles J. Crist, Jr., Attorney General, Tallahassee, and Claudine M. LaFrance, Assistant Attorney General, West Palm Beach, for appellant.
Charles Wender of Charles Wender Attorney-at-Law, Chartered, Boca Raton, for appellee.
GUNTHER, J.
The State appeals the trial court order granting James Rabb's[1] motion to suppress. James Rabb was charged with possession of Alprazolam (Xanex), possession of 3, 4-Methylenedioxymethamphetamine (MDMA), and possession of cannabis (marijuana). Rabb moved to suppress the drugs recovered from his house pursuant to a search warrant. The warrant had been issued based on a "dog sniff" at the exterior of Rabb's house by a canine trained to detect the odor of marijuana. The trial court granted Rabb's motion to suppress, and the State appeals. We affirm.
We take our facts directly from the Affidavit and Application for a Search Warrant:
On April 19, 2002 a source of information, who requested to remain anonymous, called the Broward Sheriff's Office and stated that a white male subject who was born in 1967, by the name of John Brown had a cannabis grow operation in his residence. *589 The source further explained that the residence is located on Polk Street in Hollywood, behind the Howard Johnson's Hotel.
Your Affiant and Det. Taranu investigated the allegation. A check of the Broward County Property Appraisers Office revealed that John Brown owned a residence on Polk Street in the City of Hollywood, 2839 Polk Street. During the investigation John Browns vehicle, 2011 Pontiac Firebird, Fl tag, LPS485, was observed parked in front of the residence on several occasions.
On April 23, 2002 at approximately 1530 hours, Det. Taranu and your Affiant initiated surveillance on the residence. At 1600 hours a white male, identified as John Brown, exited the residence and entered the 2001 black firebird. Mr. Brown traveled West on Polk Street, cut through the Howard Johnson's parking lot to Hollywood Blvd and entered Interstate 95 North bound. Mr. Brown traveled North on Interstate 95 with Det. Taranu and your Affiant following. During the surveillance Mr. Brown made an improper lane change and was driving approximately forty miles per hour in a fifty-five mile per hour zone.
At 1610 hours a traffic stop was initiated on Mr. Brown. While Mr. Brown was changing lanes to stop in the outside emergency lane your Affiant observed him placing his hands under the drivers seat and make several overt motions. Once Mr. Brown was stopped he was asked to exit the vehicle for officer safety. While Mr. Brown was exiting the vehicle your Affiant observed two cannabis cultivation books and one cannabis cultivation video on the front drivers seat of the vehicle in plain view. Your Affiant asked Mr. Brown for his drivers license. Mr. Brown was visually nervous, hands trembling while he was locating his license.
Mr. Brown was told that detectives were conducting an investigation and before he was asked any questions your Affiant needed to read him his rights. Mr. Brown was read his rights at which time he understood his rights and agreed to answer questions. Mr. Brown was asked if he had a cannabis grow operation inside the residence. Mr. Brown would not answer the question but stated that he was working inside the residence replacing dry-wall. Your Affiant then asked Mr. Brown about the books and video tape of cannabis cultivation inside the vehicle. Mr. Brown stated that he was just interested in cannabis cultivation.
While I was speaking to Mr. Brown Det. Taranu and his drug detector dog, "Chevy", checked the exterior of the vehicle. Det. Taranu's drug detector dog alerted to the exterior of the vehicle. The drug detector dog was then placed into the interior of the vehicle and alerted to the ashtray. One cannabis cigarette was recovered from the ashtray which field tested positive.
Your Affiant continued to speak with Mr. Brown who eventually stated that he wished to speak with an attorney. All questioning was terminated. Mr. Brown was advised that he under arrest for possession of cannabis and as detectives were about to place him into a BSO marked unit he stated that he had additional cannabis inside of his left shoe/sock. Two cannabis cigarettes were removed from Mr. Brown's left shoe/sock area. The cannabis field tested positive.
At 1705 hours Det. Taranu and his drug detector dog, "Chevy" walked by the front of the residence. The drug detector dog walked from the public roadway in front of the residence, up to the front door and alerted. The alert was consistent *590 with previous alerts when narcotics were located. Furthermore, Sgt. Damiano and Det. Taranu walked to the front door of the residence and could smell the odor of cannabis emitting from the residence.
Based on the information provided by the confidential source, the cultivation of cannabis books and video's located in Mr. Brown's vehicle, the cannabis located in Mr. Brown's vehicle as well as his person and the drug detector dog alert on the residence, your Affiant believes that a cannabis growing operation is located inside the residence.
Based on this affidavit, a search warrant was issued for Rabb's house. When law enforcement entered the house, it discovered a cannabis grow operation and sixty-four cannabis plants. Additionally, a safe was discovered containing two MDMA tablets, Alprazolam tablets, and three cannabis cigarettes. The safe also contained a key to one of the grow rooms and Rabb's Social Security card and birth certificate, which presumably identified him as James Rabb and not John Brown. Based on the evidence recovered from Rabb's house, he was charged by information with possession of the controlled substance Alprazolam, possession of the controlled substance MDMA, and possession of cannabis in an amount of twenty grams or less.
Rabb filed a motion to suppress the evidence obtained from his house, asserting that the dog sniff at the exterior of his house was an illegal search, and thus, there was no probable cause for the issuance of a search warrant for Rabb's house.
The trial court granted the motion to suppress, recognizing the question of "whether it is violative of the Fourth Amendment to conduct a dog sniff of a private residence in order to obtain probable cause for the issuance of a search warrant," to be one of first impression in Florida. It should be noted that this question was addressed in the context of the trial court's factual finding that "Taranu took Chevy to the front door of the residence where the dog alerted."[2] Considering United States v. Thomas, 757 F.2d 1359 (2d Cir.1985), as persuasive precedent, the trial court concluded that the use of the dog sniff of Rabb's house amounted to a warrantless search and could not support the issuance of the subsequent search warrant for Rabb's house. The trial court then undertook to determine whether there was sufficient lawfully obtained evidence to establish probable cause to obtain a search warrant for Rabb's house without the dog sniff, and concluded that there was not where "[t]here was no indicia of a marijuana grow house, i.e., covered windows, high pedestrian traffic, higher than normal use of electricity, etc.," the informant's veracity was not established in the affidavit, and the marijuana in Rabb's car did not establish any illegal activities in his house.
"The standard of review applicable to a motion to suppress evidence requires that this Court defer to the trial court's factual findings but review legal conclusions de novo." Backus v. State, 864 So.2d 1158, 1159 (Fla. 4th DCA 2003)(citing Batson v. State, 847 So.2d 1149, 1150 (Fla. 4th DCA 2003)).
The Fourth Amendment to the United States Constitution provides: "The right *591 of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Under the lockstep approach of Article 1, Section 12 of the Florida Constitution, the right to be free from unreasonable searches and seizures "shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court."
The question raised in this case is whether a dog sniff at the exterior of a house is a search under the Fourth Amendment. In order to be classified as a search, law enforcement conduct must violate a "`constitutionally protected reasonable expectation of privacy.'" California v. Ciraolo, 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986)(quoting Katz v. United States, 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)(Harlan, J., concurring)). Furthermore, as Justice Harlan pointed out in his concurring opinion in Katz:"As the Court's opinion states, `the Fourth Amendment protects people, not places.' The question, however, is what protection it affords those people. Generally, as here, the answer to that question requires reference to a `place.'" Katz, 389 U.S. at 361, 88 S.Ct. 507.
When considering whether law enforcement activity at a house constitutes a search, it is necessary to consider the constitutional protections afforded a house throughout the long history of the Fourth Amendment. At the center of the Fourth Amendment stands "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). In fact, "the `physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" Payton v. New York, 445 U.S. 573, 585-586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)(quoting United States v. United States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)). The Fourth Amendment operates to draw "a firm line at the entrance to the house." Payton, 445 U.S. at 589, 100 S.Ct. 1371.
Given the shroud of protection wrapped around a house by the Fourth Amendment, we conclude that Kyllo v. United States, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), controls the outcome of the case at bar. In Kyllo, law enforcement, believing Kyllo to be growing marijuana in his house, employed an Agema Thermovision 210 thermal imager to scan his house and reveal heat signatures. Id. at 29, 121 S.Ct. 2038. The thermal scan revealed that a portion of the roof and one wall of the house were relatively hot compared to the remainder of the house and surrounding houses. Id. at 30, 121 S.Ct. 2038. As a result, law enforcement concluded that Kyllo was employing halide lamps to grow marijuana. Id. Combined with further information gathered, law enforcement obtained a warrant and discovered in excess of one hundred marijuana plants in Kyllo's house. Id. Kyllo was charged with manufacturing marijuana and moved to suppress the marijuana evidence seized from his house based on the use of the thermal imager. The trial court and appellate court determined that use of the thermal imager did not amount to a search of Kyllo's house. Id. at 30-31, 121 S.Ct. 2038.
The United States Supreme Court reversed the lower courts, holding:
We think that obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical "intrusion into a constitutionally protected area," constitutes a search  at least where (as here) the *592 technology in question is not in general public use.
Id. at 34, 121 S.Ct. 2038. To conclude otherwise would "leave the homeowner at the mercy of advancing technology  including imaging technology that could discern all human activity in the home." Id. at 35-36, 121 S.Ct. 2038. Overall:
The Fourth Amendment's protection of the home has never been tied to measurement of the quality or quantity of information obtained. In Silverman, for example, we made clear that any physical invasion of the structure of the home, "by even a fraction of an inch," was too much, and there is certainly no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the nonintimate rug on the vestibule floor. In the home, our cases show, all details are intimate details, because the entire area is held safe from prying government eyes.
Id. at 37, 121 S.Ct. 2038 (emphasis in original). The relative warmth of Kyllo's house was deemed one of these intimate details, and it was a Fourth Amendment violation for law enforcement to employ a thermal imager to discern that intimate detail. Id. at 38, 121 S.Ct. 2038.
Specifically concerning law enforcement use of dog sniffs by trained canines to detect contraband, it is true that the United States Supreme Court held in United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), that "the particular course of investigation that the agents intended to pursue here  exposure of respondent's luggage, which was located in a public place, to a trained canine  did not constitute a `search' within the meaning of the Fourth Amendment." Id. at 707, 103 S.Ct. 2637. The rationale for the holding is that "the sniff discloses only the presence or absence of narcotics, a contraband item." Id. at 707, 103 S.Ct. 2637. In Place, the United States Supreme Court was not addressing the use of law enforcement investigatory techniques at a house, but rather only whether a dog sniff of luggage in a public airport constituted a search under the Fourth Amendment. The role of "place" in Fourth Amendment jurisprudence was instrumental in the decision in Place.
"Place" is no less key in the case at bar. We are of the view that luggage located in a public airport is quite different from a house, not only in physical attributes, but also in the historical protection granted by law. In United States v. Thomas, 757 F.2d 1359, 1366 (2d Cir.1985), the Second Circuit compared the dog sniff of luggage in Place with that of an apartment, and concluded that "a practice that is not intrusive in a public airport may be intrusive when employed at a person's home." The rationale for this conclusion is that "the defendant had a legitimate expectation that the contents of his closed apartment would remain private, that they could not be `sensed' from outside his door. Use of the trained dog impermissibly intruded on that legitimate expectation." Id. 1367.
This logic is no different than that expressed in Kyllo, one of the most recent pronouncements by the United States Supreme Court on law enforcement searches of houses. Had law enforcement not brought a dog to Rabb's house, it likely would not have detected the odor of marijuana emanating from the house. Thus the use of the dog, like the use of a thermal imager, allowed law enforcement to intrude into the constitutionally protected area of Rabb's house, and such reasonably could be considered a search violative of Rabb's expectation of privacy in his retreat. Likewise, it is of no importance that a dog sniff provides limited information, because as in Kyllo, the quality or *593 quantity of information obtained through the search is not the feared injury. Rather, it is the fact that law enforcement endeavored to obtain the information at all, or in this case, the fact that a dog's sense of smell crossed the "firm line" of Fourth Amendment protection at the door of Rabb's house. Because the smell of marijuana had its source in Rabb's house, it was an "intimate detail" of that house, no less so than the relative warmth of Kyllo's house. Therefore, until the United States Supreme Court indicates otherwise, we are bound to conclude that the use of a dog sniff to detect contraband at a house does not pass constitutional muster. The use of such a technique by law enforcement constitutes an illegal search.
Finally, we briefly address the dissent's attempt to differentiate Kyllo on the basis of the fact that it is concerned with the use of advanced technology by law enforcement. It is true that "the Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing a home on a public thoroughfare." Ciraolo, 476 U.S. at 213, 106 S.Ct. 1809. However, the use of enhancement to human senses often entails more than an unshielded glance at a house believed to obtain contraband. The use of dogs for investigation is a longstanding practice, but "the officers' use of a dog is not a mere improvement of their sense of smell, as ordinary eyeglasses improve vision, but is a significant enhancement accomplished by a different, and far superior, sensory instrument." Thomas, 757 F.2d at 1367. Likewise, "thermal imagers detect infrared radiation, which virtually all objects emit but which is not visible to the naked eye." Kyllo, 533 U.S. at 29, 121 S.Ct. 2038. Although a drug detector dog's sense of smell may not be technology, it, like the Agema Thermovision 210, allows law enforcement to detect that which it otherwise likely would not detect. Relying on Kyllo, we conclude that although the use of such enhancement techniques to detect contraband subsequently seized by warrant may not amount to a search in a place such as a public airport, it does when intruding into a house to discern "intimate details." See Payton, 445 U.S. at 586-587 n. 24, 100 S.Ct. 1371.
Before turning to the issue of whether there was yet probable cause to support the issuance of a search warrant for Rabb's house based on independent lawful evidence, we briefly address the dissent's assertion that our opinion directly conflicts with Nelson v. Florida, 867 So.2d 534 (Fla. 5th DCA 2004). In Nelson, the defendant checked into a Holiday Inn in Palatka, and the hotel staff reported his presence to law enforcement because he matched a profile of drug dealers who used the hotel as a point of sale. Id. at 535. Law enforcement then used a trained canine to walk the halls of the hotel and perform drug sniffs of each door. Id. The canine alerted to the defendant's door, and law enforcement found cocaine inside the room. Id. The defendant filed a motion to suppress alleging that law enforcement violated the Fourth Amendment by employing "a sensory enhancing animal that was unable to detect contraband until it was within eighteen inches to three feet of the lower door jam[b]" of the hotel room. Id. The trial court denied the motion and the Fifth District affirmed. Id.
The court's rationale in Nelson is as follows. Despite the fact that hotel rooms are constitutionally-protected areas, individuals do not have a reasonable expectation of privacy in public areas outside a hotel room, such as hallways. Id. (citing Brant v. State, 349 So.2d 674 (Fla. 2d DCA 1977)). The court then went on to reject the defendant's Fourth Amendment argument and United States v. Thomas, 757 *594 F.2d 1359 (2d Cir.1985). Nelson, 867 So.2d at 536-537. In so doing, the court cited federal precedent holding, inter alia:
"The fact that a dog, as odor detector, is more skilled than a human does not render the dog's sniff illegal. Just as evidence in the plain view of an officer may be searched without a warrant, evidence in the plain smell may be detected without a warrant."
Id. at 537 (quoting United States v. Roby, 122 F.3d 1120, 1124-1125 (8th Cir.1997)(internal citations omitted)).
For two main reasons, we conclude that Nelson neither controls nor conflicts with our decision in this case holding the dog sniff of Rabb's house to be violative of the Fourth Amendment. First, although we recognize and are in accord with the principle that "the occupants of a hotel room are entitled to the protection of the Fourth Amendment" to much the same degree as occupants of a house, this principle is not without its limitations. See Hoffa v. United States, 385 U.S. 293, 301, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). As the Fifth Circuit[3] stated in United States v. Jackson, 588 F.2d 1046 (5th Cir.1979):
Despite the fact that an individual's Fourth Amendment rights do not evaporate when he rents a motel room, the extent of the privacy he is entitled to reasonably expect may very well diminish. For although a motel room shares many of the attributes of privacy of a home, it also possesses many features which distinguish it from a private residence: "A private home is quite different from a place of business or a motel cabin. A home owner or tenant has the exclusive enjoyment of his home, his garage, his barn or other buildings, and also the area under his home. But a transient occupant of a motel room must share corridors, sidewalks, yards, and trees with the other occupants. Granted that a tenant has standing to protect the room he occupies, there is nevertheless an element of public or shared property in motel surroundings that is entirely lacking in the enjoyment of one's home."
Id. at 1052 (quoting Marullo v. United States, 328 F.2d 361, 363 (5th Cir.1964)).
Put very simply, a hotel room may be nearly identical to a house for Fourth Amendment purposes, but a hotel room is not a house, as it is neither as private nor as sacrosanct. As a result, the fact that the Fifth District held that a trained canine's dog sniff of a hotel room does not violate the Fourth Amendment because the hotel corridor is a public area, does not conflict with our conclusion that the dog sniff of a private house, such as Rabb's, violates the Fourth Amendment. This is so for the same reasons of "place" discussed above when determining that Place is not dispositive of this case, as it addressed public airports rather than private houses.
Furthermore, the distinction between unaided and technologically-enhanced surveillance is not one without a difference. The Fourth Amendment "protects conversations that cannot be heard except by means of artificial enhancement." United States v. Mankani, 738 F.2d 538, 543 (2d Cir.1984) (citation omitted). The Second Circuit explained the rationale behind this rule:
The reason for this is evident. The risk of being overheard is a given in modern life, and any time people speak to one another they necessarily assume that risk. "But as soon as electronic surveillance *595 comes into play, the risk changes crucially. There is no security from that kind of eavesdropping, no way of mitigating the risk, and so not even a residuum of true privacy." Absent a warrant, this kind of investigative intrusion bypasses the safeguards of a neutral magistrate's predetermination of probable cause.
Id. at 543 (internal citations omitted).
Because of the similarities drawn earlier in this opinion between the use of the thermal imager in Kyllo and the dog sniff in Rabb's case, it would be difficult to posit that the rationale of Mankani does not apply to Rabb's case. The risk of flowers growing in one's house being smelled by the neighbors may be a "given in modern life," but there is no way to mitigate the risk of using dog sniffs where law enforcement unaided would be unable to smell illegal drugs growing in a house. Just like an individual would never be able to soften his voice enough to mitigate the risk of intrusive surveillance, he would never be able to soften the smells of his house enough to avoid detection by the ultra-sensitive noses of dogs. To reach any other conclusion recalls the disturbing use of robot-spiders (an emblem blending both the technological advances of Kyllo and the animal senses of Rabb) to detect fugitives who softened their identities by retinal transplantation in Minority Report (Dreamworks 2002), or similar scenarios in virtually any other dystopic science fiction film. After all, the fact that conduct in a house, such as growing marijuana, is not constitutionally protected, does not mitigate the Fourth Amendment violation that occurs where law enforcement uses sensory enhancement to intrude across the "firm line" at the door of a house and into its "intimate details." As a result, the Fifth District's decision in Nelson is not dispositive of this case or in conflict with this case.
Now that we have concluded that law enforcement's use of a dog sniff at Rabb's door constituted an unreasonable and illegal search, we must consider what impact the illegality of the search has on the validity of the subsequent search warrant for Rabb's house. It is axiomatic that evidence resulting from an illegal search, such as a dog sniff of a house, cannot be the basis of probable cause supporting a subsequent search warrant. See State v. Morsman, 394 So.2d 408, 410 (Fla.1981)(citing Purcell v. State, 325 So.2d 83 (Fla. 1st DCA 1976)). Additionally, for the reasons stated by the trial court, we do not believe than any of the independent and lawfully obtained evidence in this case establishes the probable cause necessary to support a warrant. See State v. Hunwick, 434 So.2d 1000, 1001 (Fla. 4th DCA 1983). Therefore, the issuance of the search warrant for Rabb's house was in error, because the warrant was tainted by the dog sniff and unredeemed by independent lawful evidence. Consequently, the evidence obtained from the search of Rabb's house was "fruit of the poisonous tree" subject to suppression by the trial court. See Wong Sun v. United States, 371 U.S. 471, 484-485, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
In sum, we hold that the trial court did not err by granting Rabb's motion to suppress where the marijuana seized was initially discovered by a dog sniff at the exterior of his house. Based on the reasonable expectation of privacy recognized by both law and society to be associated with a house, law enforcement's use of the dog sniff without a warrant constituted a search that was not permitted by the Fourth Amendment. Furthermore, absent the dog sniff, there was no independent lawful evidence establishing probable *596 cause to issue a warrant, irremediably tainting the evidence obtained by the search of Rabb's house based on an invalid warrant. As a result, we affirm.
AFFIRMED.
FARMER, C.J., concurs.
GROSS, J., dissents with opinion.
GROSS, J., dissenting.
A dog is a dog wherever it may wander. Moving a dog from a kennel to a litter box does not make it a cat.
Similarly, if the United States Supreme Court has held that a dog sniff of luggage in a public place, such as an airport, is not a search, then a dog sniff to detect contraband is not a search from another place that is also open to the public. For reasons explained more fully below, I would reverse.
The state appeals an order granting a motion to suppress contraband seized from a private residence pursuant to a search warrant. The basis for the warrant was a dog's alert to the presence of drugs inside a residence. The circuit court characterizes the dog sniff as a search under the Fourth Amendment.
This characterization is incorrect. Article I, Section 12 of the Florida Constitution requires that the right against unreasonable searches and seizures "be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court." Art. 1, § 12, Fla. Const.; see Jones v. State, 648 So.2d 669, 674 (Fla.1994); Maulden v. State, 617 So.2d 298, 300 n. 2 (Fla.1993) (quoting Art. I, § 12, Fla. Const.).
The United States Supreme Court precedent compels the conclusion that the dog sniff was not an illegal search and that it provided probable cause to obtain the search warrant.

Facts
Appellee, James Rabb, Jr., was charged with possession of (1) Alprazolam (Xanex), (2) MDMA (commonly known as "Ecstasy"), and (3) cannabis.
The search warrant for Rabb's house was issued based on an affidavit and application for a search warrant completed by Detective Ryan Hyatt of the Broward County Sheriff's Office. The affidavit contained the following facts:
1. On April 19, 2002, the Broward County Sheriff's Office received an anonymous tip that a white male, born in 1967, named "John Brown" was growing cannabis inside his residence on Polk Street behind a Howard Johnson Hotel.
2. On April 23, 2002, Detectives Taranu and Hyatt began surveillance of the residence. At 4:00 p.m., Rabb left his residence and drove away in a black Pontiac Firebird. Following the vehicle, the detectives observed it make an improper lane change. As a result, they initiated a traffic stop.
3. Once stopped, the detectives asked Rabb to exit the car. After Rabb got out, Detective Hyatt observed two books and a videotape concerning the cultivation of marijuana located on the front driver's seat. Detective Hyatt asked for Rabb's driver's license. The officers noted that Rabb was nervous and that he located his license with "hands trembling."
4. Detective Hyatt informed Rabb that the detectives were conducting an investigation. Rabb agreed to answer questions, after the detective advised him of his Miranda rights. Detective Hyatt asked whether Rabb had a cannabis grow operation inside his residence. Rabb did not answer the question directly, but stated that he was replacing drywall in the house. *597 When asked about the books and videotape in his vehicle, Rabb replied that "he was just interested in cannabis cultivation."
5. While Detective Hyatt was questioning Rabb, Detective Taranu walked around the Firebird with his drug detection K-9, Chevy. From the exterior, Chevy alerted to the presence of drugs inside the vehicle. When placed inside the car, Chevy alerted to the ashtray. One burnt marijuana cigarette was found in the car's ashtray. The detectives arrested Rabb for possession of cannabis. While being placed in the police vehicle, Rabb informed the detectives that he had more cannabis inside his left shoe/sock area. A search of the sock revealed two additional cannabis cigarettes.
6. At 5:05 p.m., less than an hour after the traffic stop, Detective Taranu and Chevy went to Rabb's residence. Chevy "walked by the front of the residence. [Chevy] walked from the public roadway in front of the residence, up to the front door and alerted. The alert was consistent with previous alerts when narcotics were located."
Based on the information contained in Detective Hyatt's affidavit, a judge issued a search warrant for the residence.
A few hours after the warrant issued, the officers conducted the search. The detectives unlocked Rabb's residence with keys seized from his Firebird. Using the same set of keys, the detectives opened a locked room containing twenty cannabis plants, four fans, one carbon dioxide tank, a dehumidifier, and timers. Another room, which had to be broken into, contained eight cannabis plants. In a bedroom closet, the detectives located a safe containing two Ecstasy tablets, crushed Xanax pills, three cannabis cigarettes, some documents and papers containing Rabb's name, and a key that matched the lock of the broken-into "grow room." By the end of the search, detectives located four "grow rooms" containing a total of sixty-four cannabis plants.
After a hearing, the circuit court granted Rabb's motion to suppress the fruits of the search. The court held that Chevy's sniff outside of Rabb's apartment constituted a search that, in the absence of a warrant, violated the Fourth Amendment, "thus rendering the information gather[ed] from the dog's alert unavailable to support the issuance of a search warrant of the apartment." To reach this conclusion, the court relied on United States v. Thomas, 757 F.2d 1359 (2d Cir.1985). Disregarding the dog sniff, the court found that the other information contained in the warrant application was insufficient to justify the issuance of the warrant.[4]

The Standard of Review of a Warrant Search
This is an appeal of a search conducted pursuant to a warrant. The standard of review for a warrant search is that so long as the issuing magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment is satisfied. See Schmitt v. State, 590 So.2d 404, 409 (Fla.1991).[5] Both at the suppression hearing and at the appellate level, a court reviewing *598 a search pursuant to a warrant search does not undertake de novo review of the magistrate's probable cause determination. Rather, the reviewing court pays great deference to that conclusion. The reviewing court determines not probable cause, but only whether the issuing magistrate had a substantial basis for finding probable cause.
This standard of review was emphasized in Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), where the Supreme Court described how a reviewing court should appraise a warrant:
Similarly, we have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review. A magistrate's "determination of probable cause should be paid great deference by reviewing courts."
Id. at 236, 103 S.Ct. 2317 (citation omitted).
In Massachusetts v. Upton, 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984), the Supreme Court reaffirmed the Gates standard of judicial review for warrant searches:
We also emphasized that the task of a reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant.
Id. at 728, 104 S.Ct. 2085 (emphasis added).
The Supreme Court in Upton reversed the Supreme Judicial Court of Massachusetts for having conducted a de novo probable cause determination:
The Supreme Judicial Court also erred in failing to grant any deference to the decision of the Magistrate to issue a warrant. Instead of merely deciding whether the evidence viewed as a whole provided a "substantial basis" for the Magistrate's finding of probable cause, the court conducted a de novo probable-cause determination. We rejected just such after-the-fact, de novo scrutiny in Gates.

Id. at 732-33, 104 S.Ct. 2085 (emphasis added).
In this appeal, this court's inquiry is confined to the four corners of Detective Hyatt's affidavit. See Schmitt, 590 So.2d at 409. This court must determine whether the factual allegations "created a substantial basis for concluding that probable cause existed." Id.

The Issue on Appeal
The issue at the heart of this case is whether, at the front door of a private residence that is directly accessible from the street, a dog sniff of the odors of contraband emanating from the residence is a search under the Fourth Amendment.

The Movement of the Dog and Detective to the Front Door of the Residence did not Violate The Fourth Amendment
No Fourth Amendment violation occurred when Detective Taranu and Chevy went to the front door of Rabb's residence, which was accessible from the street. Based upon a long line of precedent, the space in front of the door enjoyed no constitutional protection.
The Fourth Amendment does not necessarily protect areas of a home which are "open and exposed to public view." State v. Duhart, 810 So.2d 972, 973 (Fla. 4th DCA 2002); see also California v. Ciraolo, 476 U.S. 207, 213-14, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986).
Moreover, "one does not harbor an expectation of privacy on a front porch where salesmen or visitors may appear at any time." State v. Morsman, 394 So.2d *599 408, 409 (Fla.1981); see also Fla. Dep't of Agric. & Consumer Servs. v. Haire, 836 So.2d 1040, 1055 n. 7 (Fla. 4th DCA 2003) (noting that an unfenced front yard is generally not considered protected by the Fourth Amendment due to the "lack of expectation of privacy in what is visible to the entire public"); Wysong v. State, 614 So.2d 670, 671 (Fla. 4th DCA 1993) (finding that an "unfenced front yard was equivalent to an open field through which the officer passed to get to the threshold front door"); Koehler v. State, 444 So.2d 1032, 1033 (Fla. 1st DCA 1984) (determining that an unenclosed front porch is unprotected by the Fourth Amendment); State v. Detlefson, 335 So.2d 371, 372 (Fla. 1st DCA 1976) ("It cannot be said that defendant had a reasonable expectation of privacy in the front porch of his home where, presumably, delivery men and others were free to observe the plants thereon.").
A police officer, in the scope of his duties, may approach and knock on a suspect's front door in an attempt to speak to the suspect. See Potts v. Johnson, 654 So.2d 596, 599 (Fla. 3d DCA 1995).
Here, the front door of the residence was on a direct path from the public street, about twenty or thirty feet in. Thus, there was no constitutional violation when Chevy stood at the front door of the residence for his sniff.

Under United States v. Place, a Dog Sniff of Contraband is Not a Fourth Amendment Search

Having determined that Chevy stood on constitutionally unprotected ground, the next question is whether the dog's smelling of the odor of contraband wafting from the residence constituted a search.
In United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the Supreme Court held that a canine sniff of the contents of closed luggage was not a Fourth Amendment "search." The Court wrote:
The purpose for which respondent's luggage was seized, of course, was to arrange its exposure to a narcotics detection dog. Obviously, if this investigative procedure is itself a search requiring probable cause, the initial seizure of respondent's luggage for the purpose of subjecting it to the sniff test-no matter how brief-could not be justified on less than probable cause.
Id. at 706, 103 S.Ct. 2637.
The Supreme Court's holding in Place was clear that the canine sniff was not a "search."
[W]e conclude that the particular course of investigation that the agents intended to pursue here-exposure of respondent's luggage, which was located in a public place, to a trained canine-did not constitute a "search" within the meaning of the Fourth Amendment.
Id. at 707, 103 S.Ct. 2637.
Central to the Supreme Court's conclusion that a canine sniff was not a search was its uniquely narrow scope:
[T]he sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited....
In these respects, the canine sniff is sui generis. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure.
Id. The Supreme Court's recognition that a dog sniff is "sui generis" makes that investigative technique unique in Fourth Amendment jurisprudence.
*600 The majority misreads Place when it asserts that "[t]he role of `place' in Fourth Amendment jurisprudence was instrumental in the decision in Place." The majority suggests that a constitutional violation occurred here because "law enforcement endeavored to obtain the information at all."
However, based on the cases cited above, there is no legal distinction between officers in an airport with the suspect's luggage, as in Place, and the officers and dog at the front door of Rabb's residence in this case. The Fourth Amendment did not preclude the officers in either case from being where they were when the canine sniff took place.
Decided a year after Place, United States v. Jacobsen, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), provided a fuller rationale for why a narrowly focused investigative technique, one that reveals only the presence or absence of contraband, is not a Fourth Amendment "search."
Jacobsen pointed out that the Fourth Amendment provides protection against "unreasonable searches and seizures." The Supreme Court defined a Fourth Amendment search: a "`search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." Id. at 113, 104 S.Ct. 1652.
In Jacobsen, government agents had seized some white powder belonging to the defendants. They subjected a sample of that powder to a field test for cocaine. The issue before the Supreme Court was whether the field test of the defendants' property constituted a "search." The field test infringed on the defendants' subjective expectation of privacy. However, the Supreme Court identified the critical issue as being whether that expectation of privacy was one that "society is prepared to recognize as reasonable." Id. at 122. Jacobsen characterized a protected expectation of privacy as one that is "legitimate":
A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy.... It is probably safe to assume that virtually all of the tests conducted under circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, no legitimate interest has been compromised.... Congress has decided  and there is no question about its power to do so  to treat the interest in "privately" possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably "private" fact, compromises no legitimate privacy interest.
Id. at 123, 104 S.Ct. 1652. The Supreme Court observed that its holding in Jacobsen was "dictated" by its ruling in Place; the Court referred to Place's holding that "a `sniff test' by a trained narcotics detection dog was not a `search' within the meaning of the Fourth Amendment." 466 U.S. at 123, 104 S.Ct. 1652.
Following the holdings of Place and Jacobsen, Florida courts have held that a canine sniff for contraband does not constitute a Fourth Amendment search. For example, a dog sniff of a vehicle has been held permissible because "its limited scope and method of investigation does not constitute a search." Flowers v. State, 755 So.2d 708, 710 (Fla. 4th DCA 1999) (quoting Daniels v. Cochran, 654 So.2d 609, 613 (Fla. 4th DCA 1995)); Castro v. State, 755 So.2d 657, 659 (Fla. 4th DCA 1999). "Just as no police officer need close his eyes to contraband in plain view, no police officer armed with a sniff dog need ignore the olfactory essence of illegality." State v. Hill, 770 So.2d 280, 282 (Fla. 5th DCA 2000). Furthermore, Florida courts have *601 held that a drug dog alert of a vehicle provides probable cause for a search. See Bain v. State, 839 So.2d 739, 740 (Fla. 4th DCA 2003); Hill, 770 So.2d at 282; State v. Robinson, 756 So.2d 249, 250-51 (Fla. 5th DCA 2000).[6]
The majority fails to grasp the importance of the two concepts central to Place and Jacobsen. There is no legitimate expectation of privacy in the odor of contraband; a trained dog will alert only to contraband, and not to odors or other things for which a Fourth Amendment protection exists. Its misunderstanding is evident from the statement that the "dog's sense of smell crossed the `firm line' of Fourth Amendment protection at the door of Rabb's house." It was the constitutionally unprotected odor of contraband that crossed the threshold of the home to the dog's nose, which sniffed from a place open to the public.

The Holding of United States v. Place Controls This Case Even Though the Dog Sniff Occurred at a Private Residence

The next question is whether this case differs from Place and the cases cited above because it involves not luggage or a vehicle, but a canine sniff at the front door of Rabb's home.
It is true that individuals are afforded a greater expectation of privacy in their home as compared to a vehicle. See State v. McLeod, 664 So.2d 983, 985 (Fla. 4th DCA 1995). However, as Judge Charles Moylan has succinctly written:
The higher level of justification required to satisfy the Fourth Amendment when it applies ... is not to be confused with the very different issue of whether the amendment applies. Even the enhanced protection of the home is still limited to being a protection against "unreasonable searches and seizures." It is not a protection against non-searches and non-seizures, reasonable or unreasonable.
Fitzgerald v. State, 153 Md.App. 601, 837 A.2d 989, 1030 (Ct.Spec.App.2003), cert. granted, 380 Md. 617, 846 A.2d 401 (2004).
Even though Place and the Florida cases did not involve a dog sniff at a residence, "the rationale of Place and of Jacobsen ... had absolutely nothing to do with the locus either 1) of where the dog sniffing took place or 2) of where the subjective expectation of privacy was being entertained." Id. As Judge Moylan has observed:
The raison d'etre for treating a dog sniff as a non-search is that the binary nature of its inquiry, "contraband `yea' or `nay'?," precludes the possibility of infringing any expectation of privacy that society objectively considers to be legitimate. If the possession of narcotics in an automobile or a suitcase is illegitimate, so too is the possession of narcotics in a home. It is the criminal nature of the possession itself that takes the activity out from under the protection of *602 the Fourth Amendment, not the place where the possession occurs.
Id.
The majority and the circuit court have relied on Thomas as authority to find the dog sniff a search under the Fourth Amendment. In Thomas, the second circuit held that a dog sniff of odors emanating from a residential apartment constituted a Fourth Amendment search. The court distinguished Place, reasoning that:
Here the defendant had a legitimate expectation that the contents of his closed apartment would remain private, that they could not be "sensed" from outside his door. Use of the trained dog impermissibly intruded on that legitimate expectation. The Supreme Court in Place found only "that the particular course of investigation that the agents intended to pursue here-exposure of respondent's luggage, which was located in a public place, to a trained canine-did not constitute a `search' within the meaning of the Fourth Amendment." Place, 103 S.Ct. at 2644-45. Because of defendant Wheelings' heightened expectation of privacy inside his dwelling, the canine sniff at his door constituted a search.
Thomas, 757 F.2d at 1367.
The problem with Thomas is that it is unsound; the opinion "has met with the universal disapprobation of all the federal circuit and district courts that have considered it." Fitzgerald, 837 A.2d at 1031; see also United States v. Reed, 141 F.3d 644, 649-50 (6th Cir.1998) (stating that Thomas ignored the Supreme Court's determination in Place that a person has no legitimate expectation of privacy in the possession of contraband, "thus rendering the location of the contraband irrelevant to the Court's holding that a canine sniff does not constitute a search"); United States v. Roby, 122 F.3d 1120, 1125 (8th Cir.1997) (finding that a dog sniff of a common hotel corridor was not a search); United States v. Lingenfelter, 997 F.2d 632, 638 (9th Cir.1993) (reasoning that Thomas conflicts with Supreme Court authority and "rests on an incorrect statement of law"); United States v. Colyer, 878 F.2d 469, 474-76 (D.C.Cir.1989) (determining that the appellant's reliance on the Thomas decision was unavailing and noting that the case's correctness has been "called into question"); United States v. Hogan, 122 F.Supp.2d 358, 369 (E.D.N.Y.2000) (following Thomas, but commenting that the case "appears to be at odds with Place and Jacobsen"); United States v. Sklar, 721 F.Supp. 7, 14 (D.Mass.1989) (observing that a "dwelling-like" expectation of privacy "is not justified when it is asserted with respect to contraband"); People v. Dunn, 77 N.Y.2d 19, 563 N.Y.S.2d 388, 564 N.E.2d 1054, 1056-57 (1990) (holding that canine sniff not a search under the Fourth Amendment); State v. Smith, 327 Or. 366, 963 P.2d 642, 647 (1998) (observing that Thomas "would appear to be questionable law"); Rodriguez v. State, 106 S.W.3d 224, 228-29 (Tex.Crim.App.2003) (same); Porter v. State, 93 S.W.3d 342, 346-47 (Tex.Crim.App.2002) (same); United States v. Tarazon-Silva, 960 F.Supp. 1152, 1162-63 (W.D.Tex.1997) (holding that dog sniff of dryer vent of house was not a search).
For example, in Colyer, the Court of Appeals for the District of Columbia challenged Thomas's reasoning:
As an initial matter, the very correctness of the Thomas decision is called into question by its assertion that the defendant "had a legitimate expectation that the contents of his closed apartment would remain private." As was shown above, the Supreme Court's analyses in Place and Jacobsen indicate that a possessor of contraband can maintain no legitimate expectation that its presence will not be revealed. No legitimate expectation *603 of privacy is impinged by governmental conduct that can "reveal nothing about noncontraband items."
Colyer, 878 F.2d at 475 (citations omitted).
In Colyer, the court determined that the canine "sniff of the exterior of an Amtrak roomette" was not a Fourth Amendment search. Id. at 473. The opinion emphasized the limited and binary nature of the canine inquiry:
As in Place, the driving force behind Jacobsen was the recognition that because of the binary nature of the information disclosed by the sniff, no legitimately private information is revealed: That is, "the governmental conduct could reveal nothing about noncontraband items."
...
In our view, then, Place and Jacobsen stand for the proposition that a possessor of contraband can maintain no legitimate expectation that its presence will not be revealed. Stated otherwise, governmental conduct that can "reveal nothing about noncontraband items" interferes with no legitimate privacy expectation.
Id. at 474 (citations omitted).
We should align ourselves with the majority[7] of courts that have considered the issue and hold "that a sniff by a trained dog, standing where it has a right to be, of odors emanating from any protected place, residence or otherwise, is not a search within the meaning of the Fourth Amendment." Fitzgerald, 837 A.2d at 1035.
The majority concludes that Kyllo v. United States, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) controls the outcome in this case, accepting Rabb's argument that Kyllo has "re-emphasized the sanctity and expectation of privacy of the home."
Kyllo is distinguishable because the investigative technique there at issue was not the limited one so central to the holdings of Place and Jacobsen.
In Kyllo, the police used a thermal imaging device to detect that unusual amounts of heat were being generated inside a home, a "phenomenon that is not itself criminal and could well have had a non-criminal explanation." Fitzgerald, 837 A.2d at 1036. The surveillance device was "a sophisticated piece of technology that revealed information, other than the presence of contraband, about the interior of Kyllo's home." Wilson v. State, 98 S.W.3d 265, 272 (Tex.App.2002). As the Supreme Court pointed out, the surveillance device "might disclose ... at what hour each night the lady of the house takes her daily sauna and bath...." Kyllo, 533 U.S. at 38, 121 S.Ct. 2038. The thermal imaging device was not limited to discovering the presence or absence of contraband drugs.
Unlike the Kyllo thermal imaging device, the dog sniff here disclosed only the presence or absence of narcotics; it did not "expose noncontraband items, activity, or information that would otherwise remain *604 hidden from public view." Rodriguez, 106 S.W.3d at 229.
A second distinction between this case and Kyllo is Kyllo's concern with "the advance of technology," the "power of technology to shrink the realm of guaranteed privacy," and "technology [that] is not in general public use." 533 U.S. at 34, 121 S.Ct. 2038. Fitzgerald's discussion of this aspect of Kyllo is apposite:
Kyllo's fear was that the failure to prohibit thermal imaging "would leave the homeowner at the mercy of advancing technology  including imaging technology that could discern all human activity in the home." The concern was not so much with present investigative capability but with "more sophisticated systems that are already in use or in development," as Kyllo predicted that the "ability to `see' through walls and other opaque barriers is a clear, and scientifically feasible, goal of law enforcement research and development."
Fitzgerald, 837 A.2d at 1037 (citations omitted).
The canine sense of smell is not the type of rapidly advancing technology that concerned the Supreme Court in Kyllo. As Judge Moylan has observed:
Bloodhounds have been chasing escaping prisoners and other fugitives through the swamps for hundreds of years, with posses following dutifully and trusting implicitly in the canine expertise, even at the closed doors of cabins and houses. The canine reactions, moreover, have traditionally been admissible as evidence even at a trial on the merits, let alone in an ex parte application for a warrant.
The use of the sense of smell generally is a familiar tool of perception much older than the common law or the Bill of Rights. Indeed, Blair v. Commonwealth, 181 Ky. 218, 204 S.W. 67, 68 (Ky.1918), stated that bloodhound evidence "was looked upon with favor as early as the twelfth century," as it related a declaration of King Richard I of England (1189-1199), "Dress yonder Marquis [who had stolen the banner of England] in what peacock robes you will, disguise his appearance, alter his complexion with drugs and washes, hide him amidst a hundred men; I will yet pawn my scepter that the hound detects him." It is hardly a new or unfamiliar investigative modality.
Fitzgerald, 837 A.2d at 1037.
Nothing in Kyllo compels the conclusion that Chevy's sniff at the door of the residence was a search under the Fourth Amendment. The court did not recede from Place and Jacobsen.
Finally, the majority opinion directly conflicts with Nelson v. State, 867 So.2d 534 (Fla. 5th DCA 2004). It attempts to differentiate this case by saying that the hotel corridor in Nelson is a "public area" that is different from the front door accessible to the public in this case. This approach ignores the holdings of Morsman, Haire, Wysong, Koehler, and Detlefson, cited above.
The issuing magistrate properly considered the canine sniff in deciding to issue the warrant. The magistrate had a substantial basis for finding probable cause. This court should reverse the circuit court order suppressing the fruits of the search.
NOTES
[1] The reader will notice that Rabb was referred to as John Brown in the Affidavit and Application for a Search Warrant. There is no dispute that John Brown is the same individual as James Rabb.
[2] The affidavit indicated that the dog alerted at the door of Rabb's residence. However, Detective Taranu testified that the dog tugged as he was walking along the street. At a motion to suppress hearing, it is properly the trial court's responsibility to weigh evidence and determine matters of credibility, such as resolving seemingly conflicting evidence. Brown v. State, 352 So.2d 60, 61 (Fla. 4th DCA 1977).
[3] This Fifth Circuit decision rendered prior to the October 1, 1981 circuit split is binding precedent for the Eleventh Circuit. See United States v. Zuniga-Salinas, 952 F.2d 876, 878 (5th Cir.1992).
[4] The court explained:

There was no indicia of a marijuana grow house, i.e., covered windows, high pedestrian traffic, higher than normal use of electricity, etc. Further, the veracity of the informant was not established in the affidavit. Lastly, the finding of a misdemeanor amount of marijuana on a Defendant driving a car on I-95 does not establish the growing of marijuana in his home.
[5] The majority confuses the standard of review of a warrantless search after an evidentiary hearing with the standard applicable to a search conducted pursuant to a warrant issued by a magistrate.
[6] This was not a case where there was a challenge below to the skill, training, or competence of the drug detecting dog. See Matheson v. State, 870 So.2d 8 (Fla. 2d DCA 2003); State v. Foster, 390 So.2d 469, 470 (Fla. 3d DCA 1980) (addressing factors to consider to determine whether a drug dog alert is sufficient for probable cause: "the exact training the detector dog has received; the standards or criteria employed in selecting dogs for marijuana detection training; the standards the dog was required to meet to successfully complete his training program; the "track record" of the dog up until the search (emphasis must be placed on the amount of false alerts or mistakes the dog has furnished).") (quoting Max A. Hansen, United States v. Solis, Have the Government's Supersniffers Come Down with a Case of Constitutional Nasal Congestion?, 13 SAN DIEGO L.REV. 410, 416 (1976)).
[7] Some courts have expressed concern about extending the holding of Place to private residences and have sought to temper it by imposing a requirement that the use of the "canine cannabis connoisseurs" (People v. Dunn, 77 N.Y.2d 19, 563 N.Y.S.2d 388, 564 N.E.2d 1054, 1055 (1990)) (quoting 1 LAFAVE, SEARCH AND SEIZURE § 2.2(f), at 367 (2d ed.1987)) be supported by a reasonable suspicion that contraband is present. See United States v. Whitehead, 849 F.2d 849, 858 (4th Cir.1988), abrogated on other grounds by Gonzlon-Peretz v. United States, 498 U.S. 395, 111 S.Ct. 840, 112 L.Ed.2d 919 (1991); McGahan v. State, 807 P.2d 506, 509-10 (Alaska Ct.App.1991); State v. Ortiz, 257 Neb. 784, 600 N.W.2d 805, 807 (1999). Applying these cases, reasonable suspicion existed in this case based on the tip and the discovery of marijuana cultivation magazines and cannabis in Rabb's car.